BANKERS' RESERVE LIFE CO. v. MATTHEWS et al.

No. 8670.

Circuit Court of Appeals, Eighth Circuit.

Feb. 20, 1930.

W. P. Strait, of Morrillton, Ark., for appellant.

John G. Moore, of Morrillton, Ark., and G. B. Colvin, of Perry, Ark., for appellees.

Before STONE and GARDNER, Circuit Judges, and MILLER, District Judge.

STONE, Circuit Judge.

A suit was filed by Minerva C. Matthews and another by Minerva C. Matthews and H. A. Thedford (administrator of George Henry Thedford) on two life insurance policies for $5,000 each. Mrs. Matthews was the beneficiary under one of these policies, and Mrs. Matthews and the estate were the beneficiaries under the other. These cases were consolidated for trial. From judgments upon verdicts favoring recovery, the defendant brings this appeal.

Three issues are argued here: First, that the contracts were void as wagering contracts; second, that certain statements in the application upon which the policies were based were warranties and untrue; third, that, if such statements were representations instead of warranties, they were false to the knowledge of the applicant at the time made.

I. Appellant's first contention is that these policies are void as wagering contracts. The application was by insured (George Henry Thedford) for a single policy of $5,000. When the agent forwarded this application to the company, he suggested, without the knowledge of any one else, that an additional policy for $5,000 be sent him. This was done, and the additional policy was accepted by the insured. As originally issued, both policies were to the estate of insured. Shortly after delivery of the two policies, changes in beneficiary were made so that the original policy was changed so as to be to the benefit of the estate for $2,000 and to Minerva C. Matthews for $3,000, and the additional policy changed to Minerva C. Matthews for the entire amount $5,000. Appellant makes three successive alternative contentions: First, that both policies are void as wagering contracts; second, that the additional policy, and so much of the original policy as is for the benefit of Mrs. Matthews, are void for the same reason; third, that the additional policy is void for like reason.

An insurance contract originally made for the benefit of one not having an "insurable interest" in the life insured is void as against public policy. Grigsby v. Russell, 222 U. S. 149, 154, 32 S. Ct. 58, 56 L. Ed. 133, 36 L. R. A. (N. S.) 642, Ann. Cas. 1913B, 863; Crotty v. Union Mutual Life Ins. Co., 144 U. S. 621, 623, 12 S. Ct. 749, 36 L. Ed. 566; Warnock v. Davis, 104 U. S. 775, 779, 26 L. Ed. 924; Cammack v. Lewis, 15 Wall. 643, 647, 21 L. Ed. 244; Conn. Mut. L. Ins. Co. v. Schaefer, 94 U. S. 457, 460, 24 L. Ed. 251; Gordon v. Ware Nat. Bank, 132 F. 444, 445, 67 L. R. A. 550, this court. Obviously this rule could be easily evaded if the courts looked solely to the beneficiary in the policy as issued, because there could be an immediate assignment thereof to one having no insurable interest, but for whose benefit the policy was intentionally taken out. On the other hand, it is highly desirable that life insurance policies (which are in all respects valid) should be broadly assignable by the one having such right to assign. Therefore, the rule is that "any person has a right to procure an insurance on his own life and to assign it to another provided it be not done by way of cover for a wager policy." Ætna Life Ins. Co. v. France, 94 U. S. 561, 564, 24 L. Ed. 287. Also see Midland National Bank v. Dakota L. Ins. Co., 277 U. S. 346, 350, 48 S. Ct. 532, 72 L. Ed. 911; Grigsby v. Russell, 222 U. S. 149, 155, 32 S. Ct. 58, 56 L. Ed. 133, 36 L. R. A. (N. S.) 642, Ann. Cas. 1913B, 863; Mutual L. Ins. Co. v. Armstrong, 117 U. S. 591, 597, 6 S. Ct. 877, 29 L. Ed. 997; Gordon v. Ware Nat. Bank, 132 F. 444, 446, 67 L. R. A. 550 (this court). In short, the test is the good faith in taking out the policy for the benefit of one having an insurable interest. The crux is whether the policy was a wagering contract at the time it became effective as a contract. If, at that time, such assignment was contemplated by the insured, it is a wagering contract, otherwise it is not.

Both of these policies were originally issued payable to the estate of insured and "a person has an insurable interest in his own life for the benefit of his estate." Central Nat. Bank of Washington v. Hume, 128 U. S. 195, 204, 9 S. Ct. 41, 44, 32 L. Ed. 370. Later, assignments were made of one policy and a portion of the other to Mrs. Matthews, who was a first cousin of the insured, not dependent upon him nor a creditor, and therefore having no insurable interest in the life of insured. Therefore, the question here is whether this insured, at the time these policies became contracts, contemplated assignment to Mrs. Matthews. This is a question of fact. This question was submitted to the jury, which held against appellant. The matter for our determination is the sufficiency of the evidence to justify such submission.

The two policies were on the life of George Henry Thedford for $5,000 each. The application was for one policy for $5,000. An additional policy for $5,000 was requested by the insurance agent (T. C. Scroggin) when he sent in the application. Both policies were delivered, accepted, and premiums ($170.05 each) paid thereon for the first year. The application is dated August 8, 1927. The medical examination was on August 11, 1927. The policy is dated August 19, 1927.

The application named the "Estate" of insured as beneficiary, and both policies were so issued. Requests for change in beneficiary were executed, as of September 6, 1927, on blanks furnished by the company. As to the policy issued on the application, the change was $2,000 to the estate of insured and $3,000 to Minerva C. Matthews. As to the additional policy, Minerva C. Matthews was made sole beneficiary. In each request the unconditional right to make further change in beneficiary was expressly reserved to the insured. The policies were sent to the appellant with these requests; the requested changes were made as of September 12, 1927, and the policies returned. The insured died on January 11, 1928.

The beneficiary, Minerva C. Matthews, was the first cousin of the insured and the wife of Dr. J. M. Matthews. Mrs. Matthews had nothing to do with the procuring of this insurance, the payment of the premiums, nor the change in beneficiaries, and was not, therefore, a witness. Dr. Matthews paid out the money for the first premiums, and had to do with procuring the insurance and with the change in beneficiary. The truth of his testimony is really the center of the controversy concerning this issue of whether the policies were wagering contracts. All of the other evidence upon that issue is aimed either at confirming or at denying his story. Therefore, the importance of stating that story.

A summary of his testimony is as follows: At the time here involved he was fifty-one years old and had been a practicing physician for many years, and was then located at Morrilton, Ark. He had been married about 25 years. He had known the insured about 28 years. The insured (an orphan) had been raised in the family with Mrs. Matthews by her father, who was his uncle. Insured was a tenant farmer of no means, and Dr. Matthews assisted him financially at times whenever insured sought such. Insured lived about twenty-two miles from Morrilton on a rented farm a few miles from Perryville. On the afternoon of August 8, 1927, Dr. Matthews drove up to his office, parked his car in front of a restaurant, "and George Thedford happened to be standing there." After a few minutes conversation, Thedford said:

" 'Doctor, I would like to have some insurance.' I says: 'Haven't you got insurance?' and he says: 'No, I have let it lapse.' I knew he had had some before, but did not know he had let it lapse, and he says: 'I would like to have some insurance.' At that time, just at that time I looked around and T. C. Scroggins, an agent of the Bankers Reserve Life Insurance Company, who lived at Morrilton, happened to be walking on the other side of the street, and I said 'There is an agent now, George, see him if you want some insurance.' So I hailed Scroggin and called him across the street, and told him: 'Scroggins, here is Mr. Thedford, a man who would likely be interested in some insurance.' And I left them and went to my office."

Later that day, or the next day, he learned, either from Thedford or Scroggin, that an application had been made for $5,000 of insurance. He had not discussed the matter either with Thedford or Scroggin prior to that time. The next he heard of it was on August 11, when Thedford came for his medical examination. Although he was an examining physician for appellant, the rules forbade him to examine relatives by blood or marriage, so he took Thedford up to the office of Dr. Bradley, in the same building, introduced them, and immediately left. He knew nothing more about the matter until Scroggin called him over the phone, "and asked me when I reckoned I would be going to Perry County, and when I would see George Thedford, and I says: 'I don't know, possibly in a day or so,' but I says: 'I don't know,' and he says: 'I have his policy, insurance policy for five thousand dollars.' "

He knew nothing about the additional policy for $5,000 until Scroggin called him up and said the policies had come. The next morning he saw Thedford on the street and "apprised him of the fact the insurance had come and that he had an extra five thousand dollars policy. * * * He seemed to be pleased that he had the extra policy and wanted to take them both. I suggested to him that possibly he would get more insurance than he would be able to carry, and asked him if he didn't think five thousand dollars was all he was able to carry, and he insisted he thought he could carry the two policies and cited as a reason his boys were getting large enough to do a man's work,

his wife did as much work as he did, and he was getting on his feet a little better in a financial way, he had made a good crop the year before and had prospects for this year, and he says, 'I don't see why I can't pay that. If I don't get a little insurance I will never have anything,' and he says 'I would like to take both policies.' And then he asked me to go on his note; he wanted me to help him. He didn't think I had any money, but did think I would go on his note to secure the money to meet this premium."

Dr. Matthews did not go on a note, but loaned Thedford the money.

"I told him, I says: 'George, let me—' I agreed to let him have the money—I says: 'Let me make this settlement with Scroggins, because Scroggins owes me an account and' I says 'I think I can collect it.' I says: 'Let me make the settlement with Scroggins and enable me to collect what he owes me.' "

Thedford agreed to this, and Dr. Matthews paid the premiums, less his account, to Scroggin, who turned over to him the policies to be delivered by him to Thedford, and also an acceptance receipt for the additional policy, which was to be signed by Thedford. This was about August 25. The policies were given Dr. Matthews in the morning at his office, and that afternoon Thedford came in, and the doctor delivered the policies to him. At that time Dr. Matthews was very busy, and told Thedford he would expect him to give him a note for the premiums he had paid, "and also sign these policies to me until he paid the note." Dr. Matthews never saw the policies again until September 6. A few days after delivering the policies to Thedford, he came up to Dr. Matthews' office and said "Dock I don't want to assign these policies to you. I have decided—" At this point an objection was made to stating what Thedford said, and was sustained; whereupon an offer was made to prove that Thedford "said he did not want to make an assignment, but did offer to change the beneficiary or make Minerva C. Matthews the beneficiary to the extent of eight thousand dollars." This agreement to substitute change of beneficiary for assignment of the policies was made the latter part of August. Dr. Matthews then "went to Mr. Scroggins and asked him if it, if this change of beneficiary could be made without avoiding the policy, or whether a cousin was eligible or not, and he told me that she was, and I said In that case order a change of beneficiary form or blanks."

So far as he knows, the beneficiary change blanks were received from the appellant by Scroggin on September 6. On that day he was going over to see Irwin Brown, a tenant on Thedford's farm, who had cut his foot with an ax. He took Charles C. Eddy (a lawyer and notary living at Morrilton) with him in his car in order to have the acknowledgment on the change of beneficiary blanks executed. "I was going over to see Brown, and incidentally took these change of beneficiary blanks along, and had George sign them, and also sign the acceptance receipt for the policy as I had failed to have him sign it the day I delivered it to him; he had not paid the premium. I forgot to have him sign it that day, and so that day I had him sign that also. I also had him sign the note that I had drawed up for him for the amount of this premium I had loaned him, and it all took place on September 6th."

Dr. Matthews then took the policies, signed receipt and beneficiary change papers, and delivered them to Scroggin to be sent to the appellant for indorsement of change upon the policies. The date (September 6) was filled in on the receipt by Scroggin when the executed papers were returned to him, upon the doctor's statement. The policies were indorsed at the home office and returned to Scroggin, who turned them over to Dr. Matthews who retained possession of them. The note given on September 6 had covered the amount paid for the premiums and an additional debt due from Thedford. On December 10 Thedford came over to Morrilton and wanted a loan of $50 to go to see his brother in Texas. The loan was made. A new note was made at that time to cover this loan, a small account for "illness the first of November" and the former note (of September 6) and the earlier note destroyed. He filed this note (of December 10) in the administration of Thedford's estate. At that time (December 10) he gave Thedford a receipt reading:

"Morrilton, Ark. Dec. 10, 1927.

"R. Recd of G. H. Thedford a promissory note of even date for $487.50 which settles everything to date.

"J. M. Matthews, M. D."

With one exception, Thedford had always repaid loans, and he expected him to pay this note. Dr. Matthews specifically denied there was any thought of a future change of beneficiary when the policies were taken out, delivered, or the premiums paid.

The above story of Dr. Matthews was not shaken on his cross-examination. The evidence of Dr. Bradley, Scroggin, Eddy, H. A. Thedford, and (in one respect) Walter G.

Preston supports this story, while that of Mrs. Thedford, the widow, and E. E. Peel contradicts it.

The testimony of Dr. Bradley, who made the medical examination, is that Dr. Matthews brought Thedford to his office. Matthews remained: "Just a minute, or just a second, I was doing a little work at the time he came in and he said I want to introduce you to Mr. Thedford, and says, I want you to examine him for life insurance. And I said all right, and I said sit down there and Dr. Matthews left and I finished up the work I was doing and started the examination."

He did not know when Matthews found out he had passed Thedford as a proper risk and does not think Matthews called him up about it soon afterward.

Scroggin, the agent of appellant who took the application, testified as follows: On August 8th he was walking along the street when Dr. Matthews called him across the street, to where he and Thedford were talking on the running board of a car.

"Dr. J. M. Matthews introduced me to Mr. Thedford and said that he would probably be interested in some life insurance. And Dr. Matthews left then and I talked over the proposition of selling Mr. Thedford some insurance. And the best I remember, Mr. Thedford had a policy with him in some company—I don't recall the name of the company or the amount. He had let it lapse and he was thinking of taking some more insurance. I talked over the proposition of selling him $5,000.00 of ordinary life, and finally he agreed to take it. I wrote the application for the $5,000.00, and told him to go to Dr. A. R. Bradley to be examined, and I went with him. I immediately left then and went to my office.

"Q. Were you present at the time the examination was made? A. No. I went to my office, which was then over Mr. Riddick's store, and fixed up the application. There was a space on the application blank for ordering extra policies, and I told the Company to send an extra $5,000.00 of the same kind and amount. And that I would try to deliver it."

Also:

"Q. Just state how you made the delivery and what happened at that time. A. Well, when the policies came to me through the mail, I happened to be in Dr. J. M. Matthews' office, or passing, and I told him the Thedford policies had come in. And he says 'all right, you can just let me have them'; the best I remember, 'and I will see they are de-livered.' And he paid me the premium at that time.

"Q. How did Dr. Matthews pay you the premium—by check? A. No, in money—currency. But when I wrote the application for the insurance it was my understanding that Mr. Thedford was to pay me and I gave the company's official receipt, and on the margin I stated 'to be paid on delivery of the policies.'

"Q. You mean on the day of the application you gave Thedford a receipt? A. Yes, sir, and marked it 'to be paid on delivery of the policies.'

"Q. Was that a receipt for the premium? A. Yes, sir.

"Q. But in the face it showed that it was not paid and was to be paid on receipt of the policies? A. Yes, sir, I do that all the time. I do it in preference to taking notes. I do not take notes from anybody.

"Q. Then in effect, that was a mere statement in writing that it was to be paid at delivery of the policies? A. Yes, sir. * * *

"Q. That is just for one policy? A. $5,-000.00. That is what I sold him.

"Q. How came you, at that time, not to make it for both? A. Because I didn't discuss with him taking both.

"Q. Then, you did not know you could deliver two $5,000.00 policies until the return of the policies? A. No. After going to my office and writing the letter of advice and the application, I stated in that space the order for the extra policy. I do that frequently."

He does not "remember sure," but thinks it was "something like a week or two weeks or maybe three weeks" after delivery of the policies to Dr. Matthews that he was approached regarding change in beneficiary. This was by Dr. Matthews, who said "he had been in conversation with Mr. Thedford and he wanted it changed. I said 'all right, I will order the change of beneficiary blanks down from the Home Office and fill them out, and he can execute them, and the application for change of beneficiary together with the policies will have to go back to the Company for them to make notations on the back of the policies.' * * * When Dr. Matthews told me Mr. Thedford wanted to change the beneficiary in the policies the first thing for me to do was to write the Company for a change of beneficiary blank, and when those blanks were mailed to me I turned them over to Dr. Matthews properly executed with the exception of the signature of Mr. Thedford, and at that time the policies were turned over

to me with these application blanks, and I returned them to the Home Office and they were then returned to me and I gave them to Dr. Matthews."

The extra policy was not ordered either by Dr. Matthews or Thedford. It was "several days" after delivery of the policies to Dr. Matthews and payment of the premiums by him that Dr. Matthews told him Thedford wanted to change the beneficiaries.

Eddy testified as follows: On September 6 Dr. Matthews asked him to go with him to take some acknowledgments. Dr. Matthews was going over to see a man, who lived near Thedford, who had cut his foot with an ax. On cross-examination:

"Q. I will ask you—did Dr. Matthews discuss it with you, as you went over there, about the matter any? A. No, sir, don't think anything other than just stated that we were going to a man's farm, that he lived over there—said something about going over there to see this man, and talked about insurance, said something about he felt the man had too much insurance, something about it, that is all I recollect about it."

Thedford rode back with them (about five miles) to Perryville. During this trip Thedford said "that the Doctor had always assisted him and that he felt like he could never re-pay them for what they had done for him, that he would always go to Mrs. Matthews and Dr. Matthews when he needed anything, that they would always help him get his loans and things of that nature, that they had always assisted him and he said that he felt that he never could repay them for what they had both done for him along that line."

Also on cross-examination:

"Q. Did he tell you anything about—while you were riding together on to Perryville, his original agreement with Dr. Matthews—that Dr. Matthews was to pay his premium when he took this insurance out? A. I don't believe he told me—I don't remember—but I don't believe he did.

"Q. Did he discuss it anywhere in your presence? A. Nothing further than when he signed the affidavit for change of beneficiary—

"Q. He did say then he had an original agreement with Dr. Matthews that Dr. Matthews was to pay the premium? A. They talked it over in my presence—they talked it over together.

"Q. Was that the substance of what they said? A. They agreed there—their conversation was—that the agreement was, to the best of my recollection now—that they had had this agreement sometime or other that Dr. Matthews was to pay the premiums from then on.

"Q. Well, Dr. Matthews also discussed it with him that he had paid the first? A. There was something understood between them that way. It is just like I stated before, that he signed a note to pay for the premium and some other indebtedness—I just don't remember the exact words of their agreement—but something to that effect."

They met Thedford, who was walking into Perryville with some eggs and butter which he intended to sell there. Either before or after meeting Thedford they went to the house of the injured man, Brown. Thedford had the policies with him, and said he was going over to Perryville "to have the beneficiary changed over there to Mrs. Matthews, that he was going to sign the affidavit of change of beneficiary." What took place then:

"Well, Dr. Matthews just stopped in his car when we met Mr. Thedford and spoke to Mr. Thedford and we got out of the car and Dr. Matthews told him that the blanks had come, I think he had notified Mr. Thedford, for Mr. Thedford said he knew that they were there, and Dr. Matthews told him that he had brought a Notary Public along with him, that he had just brought the blanks along with him, that it would save him a trip over to Morrilton or to Perryville, something like that, to that effect—I don't remember just the exact words, but anyway something to that effect—

"Q. Then he understood at that time when you met Mr. Thedford—when he met Dr. Matthews and you, why you gathered from the conversation that he understood that Mrs. Matthews was to be made the beneficiary in the policies, to that extent, if any such change was made? A. Yes, sir.

"Q. Then, did they when they first talked about it—when they first met, they talked and agreed on that? A. No, sir, I don't believe they did—

"Q. Did Dr. Matthews say anything to him then about having paid the premiums? A. He did.

"Q. Did he say something, or did they have any agreement that Dr. Matthews was to pay the premiums for him? A. Yes, sir, I think that it was the agreement between him and Mr. Thedford, that is, to the best of my recollection—that they agreed that Dr. Matthews was to keep the premiums paid up from then on.

534

"Q. Then Dr. Matthews was to, as you understood it from their talk, why Dr. Matthews was to pay the first premium by their agreement? A. Now, Mr. Thedford gave Dr. Matthews a note for that on that day. I understood that the note was to secure the balance due on the premium that Dr. Matthews had paid, and also some other indebtedness, too.

"Q. How much was that note for? A. Well, now, I disremember.

"Q. You have any idea as to how much it was? A. I don't know, no, sir—

"Q. Was the note already prepared for him to sign? A. I don't think it was. No, sir, I don't think it was.

"Q. What was said about the execution of the note? A. Well, as I stated before, he said it was to pay for the balance due on the premium—as I understood it—Dr. Matthews had paid for him up to that time, and also for some other indebtedness, but I don't know how much that was for.

"Q. Have you any idea? A. No, sir, I don't know—as I remember it, they were writing the note on the turtle shell, or the back of the car, and I was not concerned in that at all—I just recall that they executed that note there—that is the best I can recall about it now.

"Q. But you did understand from their conversation, and it was mentioned between them out there, that was the agreement between them, that Dr. Matthews was to pay the first premium for him and had paid it—that was the agreement, as you understood it, between Mr. Thedford and Dr. Matthews? A. Yes, sir, he had paid it.

"Q. Mr. Eddy, I will ask you, did you correct the date of the acknowledgment, or jurat to that application and show it to be on September 6th, 1927? A. Well, I knew I did it close on to September 6th—now it could have been misdated, but I am just sure that it was on that date.

"Q. But they did discuss in your presence there, about Dr. Matthews' agreement to pay that premium, and that he had paid it? A. Yes, sir.

"Q. Now, did he state how long he had known that Dr. Matthews had this application to change the beneficiary? A. No, sir, he didn't.

"Q. You say he didn't state to you how long he had known that Dr. Matthews had this application to change the beneficiary? A. No, sir, but I did say he already knew it—

"Q. Well he knew that it would be there, and that because he knew that it would be in the possession of Dr. Matthews at that time, he said that he had brought them along with him, had brought the policies along with him, was the very reason that Dr. Matthews got you to go along to take the acknowledgment, to get him to sign that application for change of beneficiary? A. I didn't state that I knew Dr. Matthews had them—I was speaking about Mr. Scroggin having them."

Dr. Matthews had the beneficiary change blanks with him. He took the acknowledgment of Thedford to the changes in beneficiary. Thedford gave Dr. Matthews the policies to have the change made.

H. A. Thedford testified as follows: He was an uncle of insured and administrator of his estate. The receipt given by Dr. Matthews to Thedford when the note of December 10 was made had been handed to him by the widow of Thedford after his death.

Preston testified as follows: He was vice president of appellant, and had handled these transactions at the home office. The additional policy was not covered by the application, but "was sent down at the request of the agent, to be subject to the acceptance of the applicant," and "the company understood this as being a mere request of the agent to send another policy on approval."

Mrs. Thedford testified as follows: Her husband had told her of taking out the insurance, and: "He told me that Dr. Matthews had had this done and had just worked him into it. He told me Dr. Matthews had had a five thousand dollar policy taken out and $3,000.00 was to be paid to me and $2,000.00 to Dr. Matthews so my husband told me. After this my husband told me Dr. Matthews had taken out $5,000.00 more insurance and made it payable to his wife and my husband said he told Dr. Matthews that this wouldn't work, that he wasn't entitled to insurance and if he could make it work why not take it out in favor of his own wife instead of Dr. Matthews' wife."

She does not remember being told anything regarding payment of premiums.

E. E. Peel testified as follows: As an insurance adjuster investigating this matter he interviewed Dr. Matthews about February 25–27, 1928, five or six weeks after the death of insured. After and while talking with Dr. Matthews, he wrote a statement which the doctor read, initialed each page, and signed. The parts of that statement pertinent to this issue are as follows:

"With reference to his insurance; I will state that my wife, Minerva Matthews, was a first cousin of George H. Thedford; and practically a sister to him; as George Thedford was brought up (an Orphan) by the father of my wife; and they were very affectionate with each other—Financially, George Thedford never amounted to very much; largely making a living as a tenant farmer; but my wife and I liked him very much—

"Thedford and I were talking about insurance one day, in the summer of 1927; and I learned that he had allowed some policies to lapse, that he formerly held—when he stated he would like to carry some other insurance, I told him that could be arranged; and about that time, Agent T. C. Scroggin passed by and I called to him, and told him Thedford wanted a policy—I left them talking together, and went away; and later on, I am not certain just how long; I learned from Thedford that he wanted to make Mrs. Matthews (my wife) a beneficiary—This was agreeable to me, and I told Thedford I would pay the premiums; and I then went to Scroggins, the agent, and had him secure an additional policy for the same amount. * * *

"The only interest that I have in the Thedford matter can be summed up as follows: I had no part in soliciting the business, or in the examination of this applicant; was not present at any time while he was examined, altho I went with him to the office of Dr. Bradley; but, when I learned that he wanted to name my wife as beneficiary, I was willing to pay the premiums on the policies, and told him so; as I considered it as a good business affair—"

On direct examination, Dr. Matthews denied that he had read this statement before signing it, saying that Peel had read it. He denies making certain statements contained therein, and explains others.

If the story of Dr. Matthews is true, these policies were not wagering contracts. That testimony is supported on important points by witnesses who are not interested in the result of this litigation. It is also attacked on important points. There was a clear-cut conflict of evidence on a matter of fact. The court properly left the solution to the jury. The instructions of the court thereon were as favorable to appellant as they should have been.

This issue must be resolved against appellant as to both policies.

II. Appellant contends that the statement of insured as to his physical condition and history, contained in the application, were warranties, and not merely representations. The basis of this contention is "that when the representations, as in the case at bar, are made a part of the policy and contract of insurance, they become warranties as a matter of law." This position is claimed to be supported by two quotations from 14 R. C. L., one from sections 207 and 208 (p. 1027) and the other from section 210 (p. 1030). The only citation of decisions are those in the footnotes to the above quotations. The quotations are as follows:

"The distinction between a representation and a warranty in an insurance contract is, that the former precedes and is not part of the contract, and need be only materially true, while the latter is part of the contract, and must be strictly fulfilled, or the policy is void. Another difference between a warranty and a representation is that a warranty must be strictly true; a representation need only be substantially true. The falsity of a representation may render the contract voidable for fraud; but a noncompliance with a warranty is an express breach of the contract. Although the effect of a breach of a warranty and of a material misrepresentation may be the same on a policy, yet they cannot be confounded together in deciding on pleadings or on a special verdict.

"As stated heretofore, a warranty must appear on the face of a policy, or in another part of it or on another paper so referred to as to become a part of the contract. It is therefore necessary to consider what is a sufficient reference to make a statement a warranty."

"Where a policy in express terms refers to the application or other papers connected with the risk, and adopts them as part of the contract of insurance, they become part of the policy, and warranties."

We will continue the first quotation to include the next following portion of the text, which is as follows:

"Preliminarily it may be said that the courts lean against a construction of a statement by an applicant as a warranty, and unless it is clearly shown by the form of the contract to have been intended by both parties to be a warranty, to be strictly and literally complied with, it will be held to be a representation. But where, taking the whole instrument together, it is obvious that the insurer has made the strict and literal exactness of the answers a condition of the

536

contract of insurance and a warranty on the part of the insured, it cannot be deprived of the advantage thus secured, for it has a legal right to say that it will determine for itself what is or is not material to the risk. In determining whether a statement is a warranty on the part of the assured, the entire policy must be considered, and if, from the whole, it appears that such statement was not intended as a warranty, it will not be so construed; where other statements and stipulations are coupled with an express and specific provision that a violation thereof shall work a forfeiture, it is evidence showing that the parties did not intend the same result from the violation of the statement or stipulation not containing such provision for a forfeiture. The court also may consider the character of the question and its answer, the opportunity of the insurer to guard against the representation in the light of its consequences, or whether it is material to the risk. Where statements are denominated 'representations' in a policy, and it would work a hardship to construe them as warranties, the policy not requiring such a construction, they will be held to be representations and not warranties."

The reason of a rule and its place in the law must measure the limits of its application. Insurance policies are purely contractual. So long as the parties thereto do not transgress some rule of public policy (declared by statute or by judicial decision), they may make any insurance contract they desire. Usually, if not universally, such contracts are induced and based upon statements desired by the insurer and made by the insured. The truthfulness of such statements enters into the contract either as an inducement or as a part thereof—usually the latter, by expression in the contract. Such statements may be either representations or warranties—the difference being that representations must be the honest belief of the insured (although they may, in fact, be untrue), while warranties must be true, irrespective of the honesty of statement. Obviously, the parties may contract that the statements will be treated as representations only or that they will be regarded as warranties. Which of the two is present in a particular contract depends upon the terms of that contract. The contract is to be construed like ordinary contracts. Where there are no expressions in the contract to make clear which the parties intend, the courts are driven to search for other indications of their meaning. It is in this search that the rule relied upon by appellant has arisen. It is to meet that situation, and that alone. It is an indicium of intention which will prevail if better means be not at hand to show intention. Obviously, it was not intended to override all expressions in the contract, no matter how clear. There is no rule nor reason for a rule that parties cannot, as matter of law, make representations a part of the contract without changing them to warranties. No public policy is served by such construction of the rule. Public policy denies such construction because public policy favors freedom of lawful contracts.

These policies expressly make the application "a part of this contract" and part of the consideration for the insurer entering into the contract. They contain a number of "Provisions and Conditions," all of which are expressly made "a part of this contract." The first of these is entitled "Incontestability," and, after stating that "this policy and the application therefor constitute the entire contract," continues in the next paragraph:

"All statements made by the insured shall in the absence of fraud be deemed representations and not warranties, and no such statement shall avoid this Policy unless it is contained in the written application therefor, and a copy of such application is attached hereto when issued."

The application contains the following:

"It is agreed on behalf of myself, and any other person who may have or claim any interest in any policy that may be issued under this application as follows (1) That the answers and statements contained in Part I and Part II, in continuation of and forming a part of this application, shall be a consideration for, and the basis of the contract of the Bankers Reserve Life Company under any policy issued under this application; and the answers and statements printed and written therein by whomsoever made, are represented to be full, complete, and true, and this agreement together with copy of this application, are hereby made part of any contract that may be issued thereon."

From the above, it is clear that the parties intended and declared that the statements in the application should be a part of the contract of insurance. It is equally clear that they intended and declared that such statements should "in the absence of fraud be deemed representations and not warranties." There is no inconsistency in the two intentions and the declarations

537

thereof, and therefore no ambiguity. The meaning being clearly expressed, there is no place for any rule of construction to ascertain the intention of the parties. Under these policies, the statements in the applications are not warranties. They are representations.

Appellant places reliance upon the wording of the acceptance of the additional policy. A part of this is: "He agrees that this shall constitute a binding application for the policy to which it is attached, subject to all the warranties and provisions contained in said original application."

Obviously, the use in such an instrument of the word "warranties" should not be construed to nullify the plain provision to the contrary in the policy itself. Such would be little short of a fraud upon the insured, and certainly that was not the intention of either party.

Being representations, they do not void the contract, even though untrue in fact, provided they were honestly made in the belief by insured that they were true. That is, they must be both untrue and knowingly falsely made by insured. Whether any one of them was both untrue and falsely made is a question of fact to be determined from the evidence.

III. We have carefully read and considered the entire evidence. There is a sharp conflict upon several points relating to the state of insured's health before the application and as to his knowledge thereof at that time. It was a case of conflicting testimony, and properly left to the jury.

The judgments should be, and are, affirmed.