## GOLIGHTLY et al. v. NEW YORK LIFE INS. CO.

### No. 10609.

Circuit Court of Appeals, Eighth Circuit.

July 30, 1936.

Rehearing Denied Aug. 31, 1936.

B. J. Semmes, of Memphis, Tenn., for appellants.

R. E. King, of Memphis, Tenn. (King & King, of Memphis, Tenn., and Louis H. Cooke of New York City, on the brief), for appellee.

Before WOODROUGH and THOMAS, Circuit Judges, and DEWEY, District Judge.

WOODROUGH, Circuit Judge.

This suit was brought by the brothers and sisters of Byrd H. Golightly, deceased, to recover upon a life insurance policy on his life issued to him by the defendant and duly assigned to the plaintiffs. The insurance company admitted that the premiums were paid as called for by the policy and that due proof had been made to it of the death of the insured on January 31, 1935, within the life of the policy, but it alleged that fraud was practiced upon it by the deceased in that the deceased had knowingly made false statements in his application for the policy for the purpose of deceiving the company and to cause it to issue and deliver the policy to him; that the company had relied upon the false statements, believing them to be true, and that it would not have issued the policy if it had known the true facts.

The insurance company also pleaded that upon learning of this fraud that had been practiced upon it, it addressed a letter to the plaintiffs (and another) in which it stated that it had elected to and did rescind the contract of insurance because of such fraud, and it tendered the return of the premium paid with interest, and offered to do whatever else, if anything, it ought to do for the purpose of such rescission.

The statements made by the insured in his application for the insurance and claimed to be false were:

"F. Have you gained or lost in weight in the last year? No."

"8. Have you ever consulted a physician or practitioner for or suffered from any ailment or disease of

"A. The brain or nervous system? No.

"B. The heart, blood vessels or lungs? No.

"C. The stomach, or intestines, liver, kidneys or bladder? No.

"D. The skin, middle ear or eyes? No.

"9. Have you ever had rheumatism, gout or syphilis? No.

"10. Have you ever consulted a physician or practitioner for any ailment or disease not included in your above answers? No.

"11. What physicians or practitioners, if any, not named above, have you consulted or been examined or treated by within the past five years? None."

The particulars of alleged falsity were specified in the pleadings of the company as follows:

"That the said Byrd H. Golightly, in January, 1933, had an attack of rheumatism accompanied by influenza, which remained with him about six months. Upon examination his teeth were found to be in a defective condition and several were extracted. For five or six months he was in fair health, but in February, 1934, rheumatism set in again, his teeth were again examined and several extracted, and he made a partial recovery.

"On the 5th day of February, 1934, he consulted with Dr. A. C. Parker and was treated by him. He had been losing weight two or three months and was weak. He was treated by the said Dr. A. C. Parker once or twice a week from February 5th, 1934, until his last illness. He grew progressively worse and in April, 1934, was sent to Gartly-Ramsay Hospital at Memphis, Tennessee. He had a mass in his right breast, the size of which increased and was painful. Treatment was continued. He again went to Gartly-Ramsay Hospital at Memphis, Tennessee, in November, 1934, with various bodily ailments and finally died on January 31st, 1935."

The insurance company pleaded further that: "Had (it) known of the treatments that had been given him by Dr. Parker prior to his physical examination and prior to the delivery of said policy, it would not have issued said policy of insurance, and that (it) relied upon the representations of the said Golightly as contained in said application that he had not been so treated, which representations were false and knowingly so and by reason of such false and fraudulent representations made by said Golightly (the company) entered into said contract. That said misrepresentations were material and did increase the hazard of the risk and that said contract is null and void and (the insur-

ance company) is entitled to a cancellation and rescission of said contract."

On the trial of the case before the court and jury, the defendant company assumed the burden of proof after the policy sued on had been offered by the plaintiffs and received in evidence; and at the conclusion of all the evidence a motion for directed verdict was made on behalf of the insurance company as follows: "Mr. King: If your Honor please, we wish to move for a directed verdict on the ground that the applicant made untrue statements in his application for insurance, from beginning with 'F' under '7' and particularly with reference to having consulted a physician and as to whether he had had rheumatism and whether he had ever had trouble with respiratory organs and particularly the untruthful answers to 10 and 11 contained in his application."

The trial court directed a verdict for the defendant company "for the reasons stated in this motion," and the plaintiffs have appealed.

There was evidence tending to prove: That Byrd H. Golightly was a cotton planter of Crittenden county, Ark., who also operated a sawmill and was an outdoor worker, 59 years old on his nearest birthday at the time of his application for the insurance in question on February 15, 1934. He lived on his farm, but boarded at the home of his brother across the road. There is no evidence that he ever had any sickness of any kind prior to the year 1933, and there is testimony that he continuously carried on all sorts of farm work, and that he never stopped work at all up to the time that he went to Gartly-Ramsay Hospital on the 1st day of April, 1934, about a month after the policy in suit was delivered to him on March 2, 1934. His brother testified that the insured "did have rheumatism for a little short while once— in 1933 I think it was, just a few days. It did not put him in bed. He continued to manage his farm and look after it. He was not down from that in any way that I know of. He had a little touch of the flue once—1933 I think. He was sick only a few days and was not in bed. I saw him every day. * * * He went to the hospital (in April, 1934) for a few days for an examination. He stayed about four or five days. He got all right again and was so all through the summer—able to ride around and look after his affairs and business and run the saw mill through the summer season. He did not go to bed at all during the summer from any kind of illness or complaint that I know of. He was at work and always fit at all times after he came back from the hospital until up in November, 1934."

Mr. Norfleet of the Sledge & Norfleet Company, which advanced money to Mr. Golightly to enable him to make his crops, saw the insured every Saturday over a long period, and knew him well. He says that "at the time of the issuance of this last policy (the policy in suit) Byrd Golightly's apparent condition of health was as it had been ever since I had known him, about forty years. He was a healthy looking man, robust, and in good health as far as I could see. He had not made any complaints to me of being ill at that time. * * * Mr. Golightly in any of his conversations with me up to the issuance of this policy that we paid for on February 24th, 1934, did not say anything to me that would lead me to believe he did not think he was in good health."

Dr. F. M. Reed, the medical examiner of the defendant insurance company who made the medical examination of Mr. Golightly, and wrote the answers to interrogatories upon the insurance application, testified that he had known Mr. Golightly 30 years and saw him frequently. The examination was made about 7 o'clock in the evening. Dr. Reed said: "I met Mr. Golightly who was out in the new ground on his horse cleaning up the land. He had some negroes out there cleaning up the land and I told him to come over to my office I wanted to make that examination and he came over and I made the examination. * * * At the time I made the examination he was in good health the best I could tell. * * * I * * * tested him with a stethoscope and tested his urine. * * * I examined his heart and examined his temperature and it was normal, 98.2. * * * His weight was about 137, I did not weigh him but that is what he told me. His general appearance was he looked normal in weight as he always had been, he did not look sick."

When Dr. Reed read to Mr. Golightly the questions numbered 10 and 11 in the application (whether he had ever consulted a physician for any ailment or disease not included in the questions as to the specific diseases and to name any physician consulted within the past five years) Mr. Golightly said "he had been to Dr. Parker with an abscess on his breast bone." Dr. Reed said, "Let's see it" and "I (Dr. Reed)

looked at it and it looked like a little boil about the size of my thumb and didn't seem to be any pus in it when I saw it." Dr. Reed testified that he wrote the answers "No" and "none" to the questions "on account of what little sickness he had had was such minor affair that I couldn't bring out anything there."

The deposition of Dr. A. C. Parker was taken by the plaintiffs, but was read in evidence by the defendant and is exclusively relied upon by the defendant to falsify Mr. Golightly's answers in the insurance application. Dr. Parker said that he had known Byrd Golightly during his lifetime, and was his physician. He was also an examiner for the defendant insurance company. He had kept a record of two occasions before the insurance policy was issued when Mr. Golightly had been examined by him at his office; on December 7, 1933, and February 5, 1934, but he had no record of any treatment given at either of these visits. As to the examination of Mr. Golightly on December 7, 1933, the doctor makes references to the condition he found as "muscular rheumatism," but he testified "practically the only trouble with him (Mr. Golightly) then was he had lumbago. * * * Pain in the lumbar muscle." The doctor stated that the examination was essentially negative. At another place in his testimony he speaks of having prescribed heating and of giving Mr. Golightly some salicylates, but the time was not fixed.

As to the examination on February 5, 1934, the doctor says: "He had this boil on his chest and a boil can cause a little fever." The doctor interpreted a notation on his office record of the examination, "The place on his chest continues to run." The doctor testified that he did not consider that Mr. Golightly was seriously ill. He says: "I thought he had just a boil on his chest and that as soon as that cleared up he would be all right. * * * During 1933 or February, 1934, or any time until I sent him to the hospital I did not consider that Byrd Golightly had anything more than a temporary and trivial ailment. * * * He was never at any time confined to his bed until he went to the hospital and I never at any time visited him at his home on account of sickness. He was always up and at work. * * * He was able to do a day's work and did work continuously. * * * He had the appearance of good health. * * * Apparently he was in good health until I sent him

to the hospital, in April, 1934, for the purpose of observation."

On his office record of the examination of Mr. Golightly February 5, 1934, ten days before the date of the insurance application, Dr. Parker wrote, "Weak. Lost about 20# wt. 127#," and such office record was in evidence. Dr. Parker was not called on to state what basis there was for his notation concerning the loss of weight. He did not testify that he had weighed Mr. Golightly or made any comparison of Mr. Golightly's weights taken at different times. When Mr. Golightly went to the hospital for observation on April 1, 1934, two hospital record blanks concerning him were filled out by Dr. Parker. In one of them a notation appears, "Loss of wt. during past 12 mo. 37 lbs.," and in the same record Dr. Parker noted that: "On the area over middle 1/3 of stem (sternum) there is an incision about one inch long and through this incision a discharge is passing. There is an area surrounding this incision which indicates a mass has been present. No mass is present now." On the other hospital record as of the same date, Dr. Parker wrote that "in January, 1933, patient had attack of rheumatism and remained six months accompanied by influenza. At this time teeth were poor. They were examined and several were extracted. For the next 5-6 months patient enjoyed fair health. In February of 1934 rheumatism set in again. Teeth were again examined and several extracted. Patient partially recovered. In February, latter part, patient noticed a mass on right breast approximate size of hickory nut. The size progressed and painful. Doctor operated and recovered fluid. Treatment has reduced this size and continued drainage has been present. Patient describes discharge as a milky white pus. No distinct pain but tenderness is present."

The doctor said that he "imagined" Mr. Golightly suffered from cirrhosis of the liver for about a year prior to his death in January, 1935. That in the early stages of cirrhosis of the liver you have no symptoms or manifestations, and it is very difficult to diagnose. A gastric ulcer was detected and treated after Mr. Golightly went to the hospital. Dr. Parker said that Mr. Golightly had influenza, "I don't just remember whether it was the early or latter part of 1933." It does not appear that the doctor found influenza by examination or treated it in any way. He associated it in his mind with the lumbago or rheumatic

attack in 1934. He later referred to the "lumbago" as hypertrophic arthritis.

Considerable of the doctor's testimony relates to his own thoughts: "I began to suspect he had something I didn't know about. * * * That could have been a tubercular condition or an adrenal mycosis condition. I mean to say about that boil on his chest I was afraid of cancer. * * * I may be wrong one way or the other about (how long the rheumatism remained)." He does not remember the date when he advised Mr. Golightly to go to the hospital prior to April 1, 1934. In many particulars his testimony is uncertain and confusing. It stands out clearly that after Mr. Golightly returned to the hospital in November, 1934, he declined rapidly until his death.

As reflecting Mr. Golightly's general attitude in the matter of obtaining the insurance, it appeared that he had carried life insurance with the defendant company in amounts from $10,000 to $35,000 for nearly 20 years and in January, 1934, about one month before he was examined for the policy in suit, he had permitted two policies aggregating the same amount as this policy to be lapsed or canceled for nonpayment of premium notes. At the time of that transaction the insurance agents found him on his farm working with a crew of negroes pulling corn and looking "like he always looked, in good health." The agents told Mr. Golightly that he could take out a new policy later. When Mr. Norfleet, whose firm was advancing money to Mr. Golightly, learned what had happened, he required Mr. Golightly to take out additional insurance and assign it to the firm. Thereupon, Mr. Golightly applied for the policy in suit, and upon the policy being delivered to him he paid the amount of a semiannual premium by his draft on the Sledge & Norfleet Company of February 24, 1934, and caused the policy to be returned to the company and changed so as to call for premiums payable semiannually instead of annually. No new application for insurance was made out, and the change of premium payments from annual to semiannual appears to have been regarded as one of the permissible changes of the insurance contract. At the end of the year 1934, the debt to Sledge & Norfleet Company was paid and the policy was assigned to the brothers and sisters. It was the only insurance on the life of Mr. Golightly at the time of his death.

The evidence as to whether the insured had gained or lost weight in the year preceding the application was conflicting. The testimony of Dr. Reed amounted to some substantial evidence that Mr. Golightly's weight at the time of the examination was normal, and in the absence of any testimony of Dr. Parker that he had weighed Mr. Golightly before he went to the hospital or had compared ascertained weights, it cannot be claimed that there was conclusive proof that the insured had suffered a rapid and substantial loss of weight prior to the application, though it is fully proven that he did afterwards.

In ruling on the motion for directed verdict the district court stated the law: "Where an applicant answers that he has not consulted a physician when, as a matter of fact, he has, then that is a material misrepresentation." The court indicated the same understanding of the law as applicable to the case when the witness Dr. Reed was being examined for the plaintiff. After Dr. Reed had examined the boil on Mr. Golightly's chest, for which Mr. Golightly said Dr. Parker had been treating him, and found no indication of pus in it, Dr. Reed wrote down the answers "No," "None," to questions 10 and 11 of the application, and explained why he put down those answers. The question was then put to him, "How did you consider the matter," which he proceeded to answer as follows, "I just—he (Mr. Golightly) said he saw him (Dr. Parker) about that boil," when the court interrupted him and clearly expressed his opinion that it did not make any difference whether the applicant and Dr. Reed considered that the applicant had only had a slight, temporary ailment. The court said: "It is whether he told the truth or not, it is a material question."

The policy contains the provision that "all statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties," concerning which clause this court said in the case of Bankers' Reserve Life Co. v. Matthews, 39 F.(2d) 528, 535, 536, 537:

" 'The distinction between a representation and a warranty in an insurance contract is, that the former precedes and is not part of the contract, and need be only materially true, while the latter is part of the contract, and must be strictly fulfilled, or the policy is void. Another difference between a warranty and a representation is that a warranty must be strictly true; a

representation need only be substantially true. The falsity of a representation may render the contract voidable for fraud; but a noncompliance with a warranty is an express breach of the contract.' * * *

"The reason of a rule and its place in the law must measure the limits of its application. Insurance policies are purely contractual. So long as the parties thereto do not transgress some rule of public policy (declared by statute or by judicial decision), they may make any insurance contract they desire. Usually, if not universally, such contracts are induced and based upon statements desired by the insurer and made by the insured. The truthfulness of such statements enters into the contract either as an inducement or as a part thereof—usually the latter, by expression in the contract. Such statements may be either representations or warranties—the difference being that representations must be the honest belief of the insured (although they may, in fact, be untrue), while warranties must be true, irrespective of the honesty of statement. Obviously, the parties may contract that the statements will be treated as representations only or that they will be regarded as warranties. Which of the two is present in a particular contract depends upon the terms of that contract. The contract is to be construed like ordinary contracts. * * *

"Being representations, they do not void the contract, even though untrue in fact, provided they were honestly made in the belief by insured that they were true. That is, they must be both untrue and knowingly falsely made by insured. Whether any one of them was both untrue and falsely made is a question of fact to be determined from the evidence."

And in Campbell v. Business Men's Assurance Co. (D.C.) 31 F.(2d) 571, 573, the court said:

"The rule is well established by the authorities, except where altered by statute, to avoid a policy for breach of a warranty, it is only necessary that the matter warranted be false in fact. It is otherwise as to mere representation constituting an inducement to the making of the contract to avoid the policy, such representations must not only be with respect to a material matter and false in fact, but it must be established that such representations were knowingly made with intent to deceive. [Citing cases.]

"This is the applicable rule to insurance contracts where the representations and statements in the application do not amount to warranties. [Citing cases.]"

And in Wharton v. Aetna Life Insurance Company, 48 F.(2d) 37, 42, this court said:

"Misrepresentations will not void a policy unless the insured knew they were false, or he was chargeable with such knowledge. (Citing cases.)

"In Bankers' Reserve Life Co. v. Matthews, supra, this court said with reference to misrepresentations alleged to have been falsely made: 'Being representations, they do not void the contract, even though untrue in fact, provided they were honestly made in the belief by insured that they were true. That is, they must be both untrue and knowingly falsely made by insured.'

"In Security Life Insurance v. Brimmer, supra [36 F.(2d) 176], this court said: 'Ordinarily false representations will not avoid a policy unless the assured knew they were false, or he was chargeable with such knowledge.'"

It will be noted that the inquiry which the questions put to Mr. Golightly was whether he had ever in his life consulted a physician for any ailment or disease, and the man was at the time 59 years old. But the matter in hand was insuring the life of Mr. Golightly. An ordinary man would understand the question to relate to some ailment or consultation that would affect or be material to the risk. He would hardly endeavor to recall every trivial ache or pain or casual mention of it to a physician.

Question 11 supplements question 10, in that it calls upon the applicant to name any physician whom he has consulted or been examined or treated by within the past five years. The same considerations are applicable to that question.

■ We think the statement of the law by this court in Wharton v. Aetna Life Insurance Company, supra, should be applied in this case: "An applicant for insurance is not required, nor indeed expected, to disclose the fact of consulting a physician for slight or temporary ailments such as an ordinary cold, inability to sleep, constipation, headache, or the like."

■ There was testimony from which a reasonable inference could be drawn that Mr. Golightly had called upon Dr. Parker

128

to have a boil treated and that the boil was a slight, temporary matter that neither had, nor could be reasonably expected to have, any relation to his longevity or the risk of insuring him.

The evidence as to Mr. Golightly's alleged rheumatism leaves it uncertain whether he had it in such identifiable form or whether it was of such severity as to require an answer, "Yes," to the question of the application ("Have you ever had rheumatism") or whether Mr. Golightly knew that he had rheumatism.

There was no proof that any influenza Mr. Golightly may have had amounted to an ailment or disease of the lungs within the interrogatory of the application, and an inference could be fairly drawn from the whole testimony that his influenza was a trivial attack of a few days' duration, and no more.

On the whole testimony we are persuaded that the court erred in sustaining the motion for directed verdict upon the grounds stated in the motion.

■ It is argued for the insurance company on this appeal that the judgment in its favor should be sustained on the ground that the insurance never took effect because Mr. Golightly "consulted or was treated by a physician (Dr. Parker) between the date of his application and medical examination and the date of the delivery of the policy to him." The allegation of the original answer of the insurance company was that the policy was delivered to Mr. Golightly on February 24, 1934, but an amendment was later allowed in which it was alleged that the policy was delivered on March 2, 1934. The examination and application were made on February 15, 1934. We observe:

(1) It was not alleged in the pleading that Mr. Golightly consulted or was treated by a physician on any named date between February 15, 1934, and February 24, 1934, or between February 15, 1934, and March 2, 1934. In other words, no specific facts were pleaded which would show breach of the specific provision of the application. Dr. Parker was not inquired of and gave no testimony as to any consultation or treatment on any designated, days within the periods referred to.

(2) The company pleaded specifically that it had elected to and did rescind the contract of insurance which it had entered on the specific ground, and none other, "because of the failure of the said Byrd H. Golightly to disclose to it in his application that he had suffered from such serious ailments etc."

(3) The motion for directed verdict upon which the court ruled is set forth above and did not call the court's attention to any facts claimed to constitute a breach of the condition precedent clause.

(4) The record on this appeal sets out the parts of the insurance contract agreed to be "essential to the issues on appeal," but nowhere includes or presents to this court any clause creating a condition precedent to the validity of the contract.

The insurance company, therefore, under the ruling of this court in Wharton v. Aetna Life Insurance Company, supra, is not in position to urge that there was a breach in conditions precedent to the validity of the insurance.

■ Our examination of the testimony has convinced that there was no sufficient proof of any specific consultation or treatment at any definite time between the date of the examination and the delivery of the policy to the insured such as would constitute a breach of the condition precedent. We do not fail to note the expression of Dr. Parker that he treated Mr. Golightly "once or twice a week," meaning possibly over the period of nearly a year. But in another part of his testimony he says that after Mr. Golightly came home from the hospital and was treated three times a week, that "he got apparently better and went about his business and I didn't see him until later on." These statements appear to be contradictory of each other and do not conclusively sustain appellants' contention.

Reversed and remanded.