## WHARTON v. ÆTNA LIFE INS. CO.
### No. 8846.

Circuit Court of Appeals, Eighth Circuit.
March 4, 1931.

Rehearing Denied April 15, 1931.

W. E. Patterson, of El Dorado, Ark., and T. J. Gaughan, of Camden, Ark. (Patterson & Rector and Walter L. Goodwin, all of El Dorado, Ark., and Gaughan; Sifford, Godwin & Gaughan, of Camden, Ark., on the brief), for appellant.

S. Lasker Ehrman, of Little Rock, Ark. (Grover T. Owens, of Little Rock, Ark., on the brief), for appellee.

Before KENYON and GARDNER, Circuit Judges, and MUNGER, District Judge.

GARDNER, Circuit Judge.

In this action appellant as plaintiff below sought to recover on three life insurance policies issued by the Ætna Life Insurance Company, appellee, upon the life of John Hawkins Wharton. The answer pleaded that false statements and representations had been made by the insured in his application for insurance, and that the policies had not become effective because they were not delivered during the good health of the insured. The policies, so far as their provisions are concerned, are all alike, except that two of them are for $10,000 each, while the other is for $5,000. They are all of the same date, and the statements in the application for each are identical. The policies all bear date August 11, 1928, and the applications all bear date July 27, 1928. The plaintiff is the beneficiary in the policies, and the surviving widow of the insured. The insured died November 18, 1928, of acute nephritis, commonly called Bright's disease. Each policy contained the following:

"All statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties, and no statement shall avoid the policy or be used in defense to a claim under it unless it is contained in the written application herefor and unless a copy of such application is attached hereto when issued.

"This policy and the application herefor, a copy of which application is attached hereto and made a part hereof, constitute the entire contract between the parties hereto, and it shall be incontestable after it has been in force during the lifetime of the insured for a period of one year from its date of issue except for non-payment of premium."

Each policy had attached an application signed by the insured. At the bottom of the

KENYON, Circuit Judge, dissenting.

application, over the signature of the insured, appears the following certificate: "I hereby certify that the above answers and statements are made by me, that they are correctly and fully recorded by the Medical Examiner, and that no material circumstance or information has been withheld or omitted concerning my past and present state of health and habits of life."

It was urged on the trial that the insured had made false answers to interrogatories 9 and 10 contained in the application. The application was on the printed form furnished by the insurance company, spaces being left in which to write the answers to the interrogatories. At the top of the page on which interrogatories 9 and 10 appear in the application, appear the following printed words in large type:

"Application to the Ætna Life Insurance Company.

"Part. 2. (Use Black Ink Only. To be Photographed)."

Subjoined to this, appears the following pertinent part of the application:

"The following answers must be made to and written by the Medical Examiner who should see that each answer is full and satisfactory. Neither the agent nor any third person should be present. If necessary, use space provided under 'Additional and Explanatory Remarks.'

The answers to these interrogatories are in the handwriting of the defendant's medical examiner, and each application was dated July 27, 1928, and it appears from the evidence that on that date the insured, who was a resident of Union county, Ark., was solicited by an agent of the defendant company to take out life insurance. He was thereupon examined by the defendant's examining physician, and in due time the policies issued under date August 11, 1928, and were delivered to the insured August 21, 1928.

At the conclusion of the evidence, the defendant interposed the following motion for a directed verdict: "We have moved for an instructed verdict in this case on the ground that the applicant John Wharton made material misrepresentations in connection with the application in answer to No. 10, that he had not consulted or been treated by a physician within the past five years."

This motion was granted, and the plaintiff saved an exception. On this appeal a number of assignments of error appear in the record, but counsel have abandoned all of them, except such as relate to the action of the court in directing a verdict.

Where the evidence is of such a character as reasonable men may reach different conclusions, the case should be submitted to the jury. Mutual Life Ins. Co. v. Hatten (C. C. A.) 17 F.(2d) 889; Crookston Lumber Co. v. Boutin (C. C. A.) 149 F. 680;

| 8. Full name of Proposed Insured | | John Hawkins Wharton | | | | | |
|---|---|---|---|---|---|---|---|
| 9. Have you consulted a physician or practitioner for or suffered from any ailment or disease of: | Yes or No | Name of disease | No. of attacks | Date | Duration | Severity | Results (if within 5 yrs. name and address of every physician consulted) |
| a. Brain or Nervous System? | No | | | | | | |
| b. Heart, Blood Vessels or Lungs? | No | | | | | | |
| c. Stomach, Intestines, Liver, Kidneys or Bladder? | Yes | Appendicitis | 1 | 1913 | 1 Mo. | Acute | Appendectomy—without drainage—Recovery |
| d. Enlarged Glands, Tumors, Goitre or Ulcers? | No | | | | | | |
| e. Rheumatism or Gout? | No | | | | | | |
| 10. Have you consulted or been examined or treated by any physician or practitioner not named above within the last five years. | Yes or No / No | Name and Address of Each | | Date | Reason for Consultation, Examination or Treatment | | |

United States Can Co. v. Ryan (C. C. A.) 39 F.(2d) 445; Gunning v. Cooley, 281 U. S. 90, 50 S. Ct. 231, 233, 74 L. Ed. 720. In considering this question the court must assume that the evidence for the party against whom the verdict was directed, proves all that it reasonably may be found sufficient to establish. In other words, it must be accepted as true for the purpose of determining the correctness of the court's ruling. The rule was stated by the Supreme Court in Gunning v. Cooley, supra, as follows: "And in determining a motion of either party for a peremptory instruction, the court assumes that the evidence for the opposing party proves all that it reasonably may be found sufficient to establish, and that from such facts there should be drawn in favor of the latter all the inferences that fairly are deducible from them. Texas & Pacific Ry. Co. v. Cox, 145 U. S. 593, 606, 12 S. Ct. 905, 36 L. Ed. 829; Gardner v. Michigan Central Railroad, 150 U. S. 349, 360, 14 S. Ct. 140, 37 L. Ed. 1107; Baltimore & Ohio R. R. Co. v. Groeger, 266 U. S. 521, 524, 527, 45 S. Ct. 169, 69 L. Ed. 419. Where uncertainty as to the existence of negligence arises from a conflict in the testimony or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury."

With this rule in mind, we turn to an examination of the testimony. First, it should be noted that the motion for a directed verdict was limited to one issue, to wit, whether the insured made material misrepresentations in answering interrogatory No. 10. It is the settled rule of this court that, in order to predicate error upon the refusal of a court to sustain a motion or request to direct a verdict, the motion or request "must be based upon a specific ground or grounds stated in apt words and brought sharply to the attention of the court. * * * A general motion stating no grounds is not sufficient." Public Utilities Corporation v. McNaughton (C. C. A.) 39 F.(2d) 7, 8; Mansfield Hardwood Lumber Co. v. Horton (C. C. A.) 32 F. (2d) 851; Denver Live Stock Commission Co. v. Lee (C. C. A.) 20 F.(2d) 531. It would defeat the purpose of the rule and be manifestly unfair to the party against whom directed, if a motion for direction of a verdict, based upon one or more specified grounds, should be held to embrace all possible grounds upon which the motion might be supported. As stated in Robinson & Co. v. Belt, 187 U. S. 41, 23 S. Ct. 16, 19, 47 L. Ed. 65: "While it is the duty of this court to review the action of subordinate courts, justice to those courts requires that their alleged errors should be called directly to their attention, and that their action should not be reversed upon questions which the astuteness of counsel in this court has evolved from the record. It is not the province of this court to retry these cases de novo."

This court in Falvey v. Coats, 47 F.(2d) 856, in referring to this rule, said: "It was due to the lower court that its attention be specifically called to the grounds upon which the motion was based; it was due to opposing counsel so that they might have an opportunity, either intelligently to oppose the motion, or ask to reopen the case for the introduction of further testimony, or for leave to amend the pleadings, or to move for a nonsuit; it was due the appellate court so as to enable that court to see whether or not the grounds urged were the same as those presented to the trial court. Where a motion for a directed verdict, failing to state the grounds upon which it is based, is denied, it is unfair to the trial court and to the appellate court; but where it is granted, it is unfair to the party against whom it is granted."

We, therefore, put to one side, as not presented by this record, the contention of the defendant that the policies were not delivered while the insured was in good health. Considerable testimony was introduced on this issue by appellee. This issue not having been covered by defendant's motion, we must assume that it was conceded that this was a jury question.

It appears from the record that the assured was forty-three years of age and had for many years been a resident of Union county, Ark., where he was employed as a salesman for a wholesale grocery company. During the five years immediately prior to 1928, with the possible exception of a few days when he was afflicted with influenza, he had lost no time from his work, and was apparently in excellent health. He was a man of good habits and fine physical appearance. In the late spring of 1928 he entered a campaign for sheriff of his county. During a strenuous campaign for sheriff he traveled over his county some three times. About the last of February or the first of March, 1928, the insured complained to his brother, Dr. J. B. Wharton, a practicing physician at El Dorado, Ark., that the night before he had a special meat dinner that unstrung him; that he felt very uncomfortable over night and was restless; that the next morning when he got up he seemed to have some disturbance in his urinary affairs and had trouble

with the bladder. He wanted the doctor to see him, and they went to the clinic where an analysis of his urine was made, also an X-ray picture of his urinary tract. Several analyses of the urine were made over about a period of a week. The first disclosed albumin, red blood cells, and pus cells. The doctor prescribed Mexican salts as a bowel eliminator and as a laxative, and this continued for about a week. After the first analysis, the albumin, blood cells, and pus cells disappeared from the insured's urine, and, although the examination was kept up for a week or ten days thereafter, there was no return of the conditions first found. During this time the insured did not go to bed and lost no time from his work, and soon afterwards entered the campaign above referred to.

Dr. Wharton, on being asked whether his brother knew there was blood in his urine, said he thought so. A number of witnesses testified to the good physical condition of the insured for a period of five years prior to August, 1928; that he had not complained of feeling badly, and that during the year 1928 he made a very vigorous campaign for sheriff of Union county, which concluded in August. On cross-examination, Dr. Wharton testified that he had prescribed for his brother on December 23, 1927, February 12, 1928, February 16, 1928, May 9, 1928, and July 24, 1928. These prescriptions consisted of anti-malarial caps for cold, calomel, rhubarb, soda, and pepsin as a purgative, Epsom salts and citro carbonate as a laxative, Dovers powder, aspirin and caffeine for a cold, and tincture of aconite for a cold. Some of these prescriptions were signed by the doctor, and some were given over the telephone. The doctor, in most instances, communicated with his brother over the telephone. The doctor testified: "He (the insured) usually called me up over the phone and asked me to fix up something like a purgative for a cold, and I would call up Mr. Hall and send it to him." The prescriptions were usually given for a cold or a headache, to relieve constipation or some minor indisposition or ailment. The doctor, being asked with reference to citro carbonate, said:

"It comes in crystals like effervescing soda. It is pleasant to take. It is a laxative. I gave him that to carry with him. He liked it. I fixed that up and sent it to him at his request. Here is a prescription written on July 24th, Dovers powder, aspirin, caffeine, a few grains of each. He had been in the dust, driving, he said, and his nose and throat

were stopped up, had an acute cold. He had just a summer cold and I prescribed that for him.

"Q. He wasn't sick in bed? A. No; he was out in his campaign. He had a summer cold. I recollect now I gave him that. I remember it now since I recollect what I gave it for. And here is one on the same date, a little solution for rhinitis, to dry up the membrane, a little syrup of emulsion, put that in lactate of pepsin, as a vehicle to take along and take a solution of that to dry that up, to relieve the irritation in the nose and throat. That is just an ordinary prescription to take for a cold. And here is one in 1927, He must have had a little cold. I gave him some tincture of aconite, atrophine sulphate mixture to alleviate a little cold. That was back in 1927, in November."

The doctor testified that the prescriptions were such as were given to well folks as well as sick folks in that country. The examinations and tests made by Dr. Wharton were made in the Purifoy-Mayfield Clinic, and he was assisted by Mrs. Aerial Goodwin, technician, employed at the clinic, and it was she who made the urinalysis, as well as the X-ray pictures. Both Dr. Wharton and Mrs. Goodwin testified that they did not disclose to the insured the result of the urinalysis, because they wished first to see whether it amounted to anything, and that when they found on the next day that it had cleared up, and there was no return of the condition, they themselves thought nothing further about it.

Going to the question as to whether or not the insured was in good health on the 21st of August, 1928, when the policies were delivered, testimony was introduced, showing the result of another examination made of insured's urine on the 22d, 23d, or 24th of August, 1928, and based on the result of that examination, which showed albumin, a few pus cells, and granular casts, experts testified for the defendant that, if on that date the urinalysis showed albumin and granular casts, the condition of the insured would be the same on the 21st of August. Experts for the plaintiff, however, denied this contention, testifying that at least, without a fuller showing as to the health and condition of the patient, it could not be said what the condition of his health would be on any preceding day, as the disease with which he died frequently developed very rapidly. On the 25th of August, 1928, the insured left for Hot Springs, Ark., where he was treated, and there is no question but that from that time on he suffered from acute nephritis, or

Bright's disease, dying therefrom November 18, 1928.

As before observed, the issue as to whether the insured was in good health when the policies were delivered is not before us because not covered by the motion, but it is clear that the testimony on the question was such as to make it a jury question.

Referring now to interrogatories 9 and 10, the answers to which it is claimed by the defendant were knowingly false, it is again observed that the motion for directed verdict limited the ground to the answer to interrogatory 10. However, in considering the question as to whether the answer to interrogatory No. 10 was knowingly false, it is necessary to refer to the answer to 9c, supra, and hence, liberally construed, the motion may be said to cover the answers to both of these interrogatories. Question 9c was whether he had consulted a physician or had suffered from any ailment or disease of the stomach, intestines, liver, kidneys, or bladder, and his answer was "Yes." Under the heading "Name of disease" appears the word "Appendicitis"; under the heading "No. of attacks" appears the number "1"; under the heading "Date" appears "1913"; under the heading "Duration" appears the words "1 Mo."; under the heading "Severity" appears the word "Acute"; under the heading "Result (if within five years name and address of each physician consulted)" appears the words "Appendectomy—without drainage—recovery." The disease and operation not having occurred within five years, he was not required to give the name of any physician and did not do so. The directions to the medical examiner, printed at the head of the page, were to the effect that the examiner should see that each answer was full and satisfactory. The examiner who made out the application, although available, was not called by the defendant.

. Can it be said that this answer was false? The answer was in the affirmative, and that was certainly not a false answer, but it is claimed that the answer taken as a whole necessarily meant that the insured had not consulted a physician at any other time, and had not suffered from any ailment or disease other than appendicitis. The blank being furnished by the insurance company, and the answers being written by its examining physician and he not being called, and the insured being dead, left this interrogatory and answer standing alone for interpretation. The defendant's examining physician might have aided the court and jury, had he been placed upon the witness stand, and under these circumstances we are of the view that it cannot be said that all reasonable men must have concluded that the answer to this interrogatory was knowingly false. The jury might have believed from the evidence, and the favorable inferences that might reasonably have been drawn therefrom, that the other ailments from which the insured had suffered were of a trivial character, such as colds, constipation, headache, and an attack of the flu, and might honestly have been believed by him, as well as by his examining physician, to have been of no consequence. It must be borne in mind that the uncontradicted evidence was to the effect that the insured was an active, robust, and apparently healthy man, and that he was not advised as to the result of the urinalysis made by Dr. Wharton and Mrs. Goodwin in February or March, 1928; and, in view of the fact that thereafter he conducted a strenuous campaign and was not confined to bed until after the date of these applications, the jury might reasonably have concluded that neither he nor his physician realized that he was afflicted, even in an incipient stage, with the disease which ultimately caused his death.

There was one bit of testimony which should be here considered. Dr. Wharton, after testifying that he had not advised the insured as to what the examination revealed, was interrogated as follows:

"Q. He told you he had blood in the urine? A. He thought it was."

This, to a physician, might indicate a serious condition, but apparently even from a medical standpoint the symptom was not necessarily serious. The insured, however, was a layman. The symptoms disclosed disappeared, and inasmuch as his physician did not seem to consider the symptoms serious, and did not advise the insured that it was serious, but permitted him to continue in a strenuous occupation, whereas, had the doctor thought him afflicted with Bright's disease, he should have prescribed complete rest, reasonable men might have concluded that neither the insured nor his physician knew that the symptoms disclosed a diseased condition of a serious character, or anything more than a trivial temporary disturbance.

Misrepresentations will not void a policy unless the insured knew they were false, or he were chargeable with such knowledge. Security Life Insurance v. Brimmer (C. C. A.) 36 F.(2d) 176, 179; Bankers' Reserve Life Co. v. Matthews (C. C. A.) 39 F.(2d) 528, 537; Moulor v. American Life Ins. Co., 111

U. S. 335, 4 S. Ct. 466, 28 L. Ed. 447; Mutual Life Ins. Co. v. Hilton-Green, 241 U. S. 613; Northwestern Mutual Life v. Wiggins (C. C. A.) 15 F.(2d) 646; New York Life Ins. Co. v. Griffith (C. C. A.) 35 F.(2d) 945; Adler v. New York Life Ins. Co. (C. C. A.) 33 F.(2d) 827; Metropolitan Life Ins. Co. v. Johnson, 105 Ark. 101, 150 S. W. 393.

In Bankers' Reserve Life Co. v. Matthews, supra, this court said with reference to misrepresentations alleged to have been falsely made: "Being representations, they do not void the contract, even though untrue in fact, provided they were honestly made in the belief by insured that they were true. That is, they must be both untrue and knowingly falsely made by insured."

In Security Life Insurance v. Brimmer, supra, this court said: "Ordinarily false representations will not avoid a policy unless the assured knew they were false, or he were chargeable with such knowledge."

 The burden of proof was, of course, upon the defendant, and fraud is not to be presumed. An applicant for insurance is not required, nor indeed expected, to disclose the fact of consulting a physician for slight or temporary ailments such as an ordinary cold, inability to sleep, constipation, headache, or the like. Adler v. New York Life Ins. Co. (C. C. A.) 33 F.(2d) 827, 832; Bankers' Life Co. v. Hollister (C. C. A.) 33 F.(2d) 72, 74; Connecticut Mutual Life Ins. Co. v. Union Trust Co., 112 U. S. 250, 5 S. Ct. 119, 28 L. Ed. 708; Mutual Reserve Life Ins. Co. v. Dobler (C. C. A.) 137 F. 550; New York Life Ins. Co. v. Cumins (C. C. A.) 24 F.(2d) 1; Ward v. Standard Accident Ins. Co. (C. C. A.) 30 F.(2d) 328, 63 A. L. R. 842; New York Life Ins. Co. v. Moats (C. C. A.) 207 F. 481; Miller v. Maryland Casualty Co. (C. C. A.) 193 F. 343.

In the case of Adler v. New York Life Ins. Co., supra, greatly relied upon by the defendant, it is said: "It may be that failure to remember diseases or treatments or omissions of such as are honestly thought to be trivial or not within the meaning of the questions in an application may disprove the presence of fraud."

In Bankers' Life Co. v. Hollister, supra, the defendant contended that an answer to a similar question was false, and in the course of the opinion it is said: "Furthermore, the application must be liberally construed in favor of the insured, and, under the weight of authority, an applicant for insurance is not required or expected to disclose the fact of employing or consulting physicians or surgeons for slight and temporary ailments which leave no trace of injury to health, such as an ordinary cold or inability to sleep because of occasional excesses, such as existed in this case."

 In the instant case the insured categorically answered the interrogatory in the affirmative. He did not say that the only time he had consulted a surgeon or had any ailment was when he had appendicitis, and he was not required to give the name of the physician unless the consultation had occurred within five years. The jury might, under the evidence, have believed that the insured in good faith believed that, except for the appendicitis, all other ailments for which he had consulted a physician were of a trivial character. To void this policy on the ground of false representation, the answer must not only have been untrue, but it must have been with reference to a material matter, and must have been knowingly false. When it is doubtful whether the misrepresentation was material or not, the question of materiality must be submitted to the jury.

Passing now to the answer to interrogatory No. 10, it is observed that by this interrogatory, the insured was asked whether he had consulted or been examined or treated by any physician or practitioner not named above, within the last five years. The record shows that he had not consulted nor been treated by any physician, except his brother, Dr. J. B. Wharton. In the preceding answer, he had stated that he had consulted a physician. He had in fact consulted but one physician; so when, in interrogatory 10, he was in effect asked what physician not named above he had consulted, having in mind that he had consulted only one physician, he answered "None." This may have left the answer somewhat ambiguous, but not necessarily knowingly false.

 What has been said with reference to the materiality of the matter involved in the answer to interrogatory 9 is, of course, equally applicable here. Not only was the printed matter in this application furnished by the defendant, but the written matter was placed therein by defendant's representative, so that the entire application, printed and written, was prepared by the defendant. If the application then, as a whole, was ambiguous, this ambiguity was attributable to the defendant rather than the insured, and as said by this court in Business Men's Assur. Co. v. Campbell, 32 F.(2d) 995, 997: "The rule is settled that in case of ambiguity that construction of the policy will be adopted

which is most favorable to the insured.' Mutual Life Ins. Co. v. Hurni Packing Co., 263 U. S. 167, 44 S. Ct. 90, 68 L. Ed. 235, 31 A. L. R. 102. In the absence of fraud, the applicant's failure to disclose facts about which no questions are asked will not avoid a policy."

We are of the opinion that under the testimony in this case, with such favorable inferences as might reasonably have been drawn therefrom, the most that can be said is that the facts and attendant circumstances were such that fair-minded men might reasonably draw different inferences or conclusions therefrom, and hence the case was one for the jury and not for the court to decide.

The judgment of the lower court should be and is reversed, and the cause remanded, with directions to grant the plaintiff a new trial.

KENYON, Circuit Judge (dissenting).

My firm conviction that the trial court was right in directing a verdict for the defendant in this case forces me to dissent from the opinion of the majority. The motion to direct a verdict was on the ground that the applicant made material misrepresentations in answering question 10 of the application. I think the assigned reason of the motion is immaterial if the judgment below was in fact a right one. Stipcich v. Insurance Co., 277 U. S. 311, 48 S. Ct. 512, 72 L. Ed. 895.

The insured received from defendant three policies of life insurance, aggregating $25,000. Applications were signed on July 27, 1928. The policies were dated August 11, 1928, and were delivered to insured on August 21, 1928. The insured died on November 18, 1928. Insured had $7,000 of insurance on his life prior to these policies.

The policies provided in article 10 that statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties. In my judgment there was no absence of fraud in this matter. The evidence seems overwhelming that the whole performance was an ingenious fraud practiced upon the insurance company, and hence the statements were not merely representations. However, that is not of controlling importance. The applications for the policies contained as stated in the majority opinion questions and answers, the important ones being 9 and 10. The application contained the following:

"I hereby certify that the above answers and statements are made by me, that they are correctly and fully recorded by the Medical Examiner, and that no material circumstance or information has been withheld or omitted concerning my past and present state of health and habits of life.

"Dated at El Dorado Arkansas, this 27, day of July 1928.

"In presence of L. L. Purifoy, M. D. Proposed Insured must sign here 'John Hawkins Wharton.' "

I refer to some of the evidence. Mrs. Goodwin, who conducted the Purifoy-Mayfield Clinic, testifies that, in the late winter of 1927 or early spring of 1928, the insured came to the clinic in company with his brother (Dr. Wharton); that she made pictures of his urinary tract and examined a specimen of his urine; that Dr. Wharton directed her to make X-ray picture of the urinary tract; that insured came to the clinic alone quite frequently and left specimens of urine on different occasions; that she made these examinations for a week or ten days and made the reports to Dr. Wharton; that the next time Dr. Wharton was there was the 22d or 23d of August, 1928; that he brought a specimen for the urinalysis test; that a report on that was made to Dr. Mayfield, and within a day or two insured went to Hot Springs. These tests showed a very bad condition of the kidneys and bladder, to which reference is hereinafter made.

Dr. Wharton testified as to the general examinations of his brother, the insured, of the making of X-ray pictures of his brother's urinary tract; that he took him to the clinic the first time he was there; that his brother brought Mrs. Goodwin specimens for analysis of his urine several times, and that Mrs. Goodwin was acting for him in making these urinalyses; that his brother told him of having blood in the urine. Dr. Wharton testified there was no doubt that insured had consulted him as a physician during the five-year period. The evidence shows he doctored him for kidney and bladder trouble, and that he was troubled about his brother's condition right up to the time the policies were issued.

The question involved is not alone the knowing false answers to questions 9 and 10, but whether insured fraudulently withheld material information from the insurance company as to his past or present condition of health. As to the alleged false answers, it is of course true that material false statements in an application for insurance as to consulting a physician relieve an insurance company from liability if the insured knew that the statements were false. New York Life Ins. Co. v. McCarthy (C. C. A.) 22 F.(2d) 241;

Security Life Ins. Co. of America v. Brimmer (C. C. A.) 36 F.(2d) 176; Bankers' Reserve Life Co. v. Matthews et al. (C. C. A.) 39 F. (2d) 528.

Question 9 is as follows:

"Have you consulted a physician or practitioner for or suffered from any ailment or disease of: * * *

"c. Stomach, Intestines, Liver, Kidneys, or Bladder?

"Yes, Appendicitis, 1 attack, Date? 1913, Duration? 1 month. Severity? Acute. Results? Appendectomy—without drainage—Recovery."

Did the term appendicitis give any information as to his kidney or bladder trouble? Is the answer to question 10 any fairer or more honest? He was asked in 10 if he had been treated by any physician or practitioner not named above. He said, "No." No physician was named above, and the evidence shows he had consulted his brother frequently, and he consulted other physicians about the time the policy was issued, though perhaps shortly thereafter. He had had many examinations in the five months preceding that time at the Purifoy-Mayfield Clinic. Why did he not say so in answer to interrogatory 10? Why did he not tell about the examinations of his blood and urine by Mrs. Goodwin? It cannot be said that his brother was not another physician than referred to in question 9, because there was no particular physician referred to in 9. The answer to 10 is therefore clearly false, though both answers show a considerable cunning in the effort to conceal the truth as to insured's physical condition. These answers conveyed no information to the company as to his real condition, which he must have known. All he disclosed was that he had been treated for appendicitis. It was a partially true answer, which may be more deceptive than a falsehood. Truth may be concealed, as well as revealed, by language. The purpose of the application was to secure facts as to his physical condition. He carefully and ingeniously concealed them. How can it be said that no material fact was knowingly withheld from the insurance company by the insured as to the condition of his health? This relationship demanded good faith both from the insured and from the insurance company. The Supreme Court in Mutual Life Insurance Co. v. Hilton-Green, 241 U. S. 613, 624, 36 S. Ct. 676, 680, 60 L. Ed. 1202, said: "Beyond doubt an applicant for insurance should exercise toward the company the same good faith which may be rightly demanded of it.

The relationship demands fair dealing by both parties." The same point is stressed in Stipcich v. Metropolitan Life Insurance Co., 277 U. S. 311, 48 S. Ct. 512, 72 L. Ed. 895; and in Adler v. New York Life Ins. Co., 33 F.(2d) 827, 832, this court says: "Also, the evidence leaves no doubt of the materiality of the matters concealed. In addition, it is difficult to imagine an honest frame of mind in an applicant who thinks it would be immaterial for an insurer to know that he had been under practically continuous treatment for more than two years immediately preceding and at the time of the application." The language of this court in Mutual Life Ins. Co. of New York v. Hurni Packing Co., 260 F. 641, 645, is interesting: "A chief part of any insurance company's business is a discrimination in selecting risks lest the natural and average losses may be exceeded. The purpose of the inquiries made as to prior consultations or treatments by physicians is to furnish to a life insurance company the information, either that the applicant has had continuous prior good health or the names of the practitioners consulted, so that the company may decide what further inquiries should be made in view of such disclosures. That such consultations were for what seemed to the applicant or his physician but trivial ailments is beside the question. It is the materiality to the company's investigation and decision as to acceptance of the risk that is involved. Inquiries as to prior attacks necessitating the attendance of physicians may disclose information not to be found by the medical examiner's own efforts. The history of the patient may be quite essential to supplement a physical examination."

Could anything be conceived more untruthful in an application, in view of all the facts, than a statement that nothing was concealed from the company concerning the insured's past and present state of health? For seven months prior to the application he had been consulting his brother, a physician, and having prescriptions given him. Albumin and pus in the urine are not small or trivial matters, as are sometimes referred to by the courts. They are more than colds and headaches, they are symptoms of incipient Bright's disease, and a man associating so closely with a doctor brother as this insured did and in constant communication with him must have known his condition. It is contrary to human nature to think it was not fully discussed between them. On his first visit to Mrs. Goodwin's laboratory in the early spring of 1928, she found albumin, blood, and pus cells in his urine. Was not

the company in any semblance of fair treatment entitled to know this before issuing policies for $25,000?. She reported to Dr. Mayfield on the 23d or 24th of August, almost exactly the date of the policies, that her tests then showed a heavy increase of albumin. Was a man in this condition a well man on August 22d when the policies were given? If the insurance company had known of the first examination and the pus and the blood in the urine, would it have issued the $25,000 of policies on the life of the man who had taken only $7,000 of insurance when he was well? After the discovery at the second examination that the albumin had greatly increased over what it was at the first examination, the insured with his $25,000 policies, which he could not have secured except by deceiving the insurance company, went to Hot Springs, Ark., for treatment, and within three months died from Bright's disease, the very thing that the evidence shows he had when the policies were issued. Was there no deception practiced upon the company? The testimony of his own brother, naturally somewhat reluctantly given, condemns the transaction. Insured consulted him within three days preceding the applications for the policies. If that fact had been disclosed in the applications, would any policies have been issued? In Stipcich v. Metropolitan Life Ins. Co., 277 U. S. 311, 322, 48 S. Ct. 512, 515, 72 L. Ed. 895, the Supreme Court said: "But the respondent's answer sets up that certain answers given in the written application as to the insured's recovery from his earlier illness, its recurrence, and with respect to consultation of physicians, were false and known by him to be false when he signed the application. It is now suggested that Stipcich in his application made a positive misrepresentation regarding a visit to a physician the day before he applied for insurance. If that were clearly established we would consider it necessary to affirm the judgment below, although we think the rulings on which it was based erroneous."

My mind is unable to reach any other conclusion than that the insured made false answers to interrogatories 9 and 10 of the applications, and that he knew they were false; that his statement that no material circumstance or information had been withheld or omitted concerning his past and present state of health was absolutely false and known by him to be false. From the evidence it is also apparent that he was not in good health on the date of the delivery of the policies and that he knew he was not in good health. It was his duty to make that fact known to the company. This whole transaction smacks of fraud. When insured was well he needed only $7,000 of insurance; when marked for death by Bright's disease he secured $25,000 more by fraudulently concealing from the insurance company his true condition. No one would claim that these policies would have been issued if the company had known his true condition of health. It was his business to tell it the truth. He did not do so. Why then should his beneficiaries profit by this fraud? Appellant is not entitled to recover as a matter of law. It seems to me the trial court on this record could not have permitted a verdict for plaintiff to stand, and hence did right in instructing a verdict.