**NORTHERN LIFE INS. CO. v. KING.**
No. 6442.

Circuit Court of Appeals, Ninth Circuit.
Nov. 9, 1931.

Rehearing Denied Dec. 14, 1931.

Butler, Van Dyke, Desmond & Harris, of Sacramento, Cal., for appellant.

Allen & McNamara, of Yreka, Cal., and T. A. Farrell and Frank L. Murphy, both of Sacramento, Cal., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and JAMES, District Judge.

JAMES, District Judge.

On the 25th day of September, 1928, plaintiff issued an insurance policy covering the life of Frank Mathew Kasshafer for the

614

amount of $2,500. The policy included additional provisions which covered the insured in the event of death by accident in the further sum of $2,500, and in the additional sum of $2,500 in the event accidental death was caused while the insured was operating, driving, riding in, or was struck by, an automobile. Application for this policy had been made on or about the 18th of August of the same year.

The insured died on February 25, 1930. On June 17, 1930, and prior to any action being instituted to recover under the terms of the policy by the beneficiary, the insurance company brought this suit, wherein it sought to have rescission of the contract of insurance decreed. The ground of the action, as alleged, was that the insured had, in answer to questions set forth in his written application, fraudulently represented that he had not consulted any physician within the three years prior to the date of the application in respect to an illness arising from peptic ulcer, except Dr. Paul Wright, who had treated him in 1925 for that physical disorder. It was alleged that, in fact, insured had not, at the time such representations were made, recovered from the illness mentioned, and, quoting from appellant's bill: "The duration of said illness exceeded three weeks; said illness was severe and not moderate; he had consulted another physician in respect of said illness from peptic ulcer in November of 1927, and in September of 1928, at both of which times he had received treatments for pain and hemorrhage from duodenal, or peptic, ulcer; that in spite of the fact that intermediate the application for said policy and examination of applicant and the delivery of said policy to applicant, applicant had received medical treatment for duodenal or peptic ulcer, and hemorrhage and pain resulting therefrom, said applicant fraudulently concealed said facts from plaintiff, and on the contrary, accepted said policy, receipting therefor as hereinbefore alleged in violation of his agreement contained in said application * * * to the effect that said insurance should not become effective unless and until the policy should be delivered to him during his lifetime and good health."

Emma C. King, the beneficiary under the insurance policy, defendant in the action (appellee here), answered the complaint, denying the facts as alleged, and by way of cross-complaint prayed for judgment on the insurance policy for the sum of $7,500; alleging that the death of the insured had occurred through accidental means and through the

wrecking of an automobile in which he was riding on the 25th of February, 1930. The case was heard before a district judge, who gave judgment for the cross-complainant.

The physician who made the examination of the insured for appellant (Dr. Wright) was the physician who had also in March, 1925, attended and treated the insured for peptic ulcer. The form used by appellant's examining physician contained, first, a printed list of various diseases. The applicant was required to make answer as to whether he had suffered from any of them. The examining physician orally stated the question to the appellant and filled in the answers. The applicant signed the completed form at the bottom. On this list of diseases, the answers appear "No," with the exception as to question "G. Dyspepsia or indigestion? Yes," and excepting the following:

"Illness—Peptic ulcer
"Number of Attacks—Dates, March 1925
"Duration—3 Wks
"Severity—Moderate
"Complications—None
"Result and remaining effects—Recovery
"Physician—Paul Wright
"Address—Mt. Shasta, Calif."

Following was this question, with the answers:

"7. Have you consulted any physician within past three years?—Yes.

"If so, give particulars required under question 3, above.—Peptic Ulcer—see above."

The medical examiner, in a statement transmitted with the report of his examination, advised the company, referring to the applicant's condition: "He seems to be entirely recovered from the ulcer of stomach. I have seen him frequently & am quite intimate with him & have not been consulted. He works hard on his ranch every day & to my best judgment is in good health at this exam."

Dr. H. A. Hess was called at the trial as a witness for appellant, and it is upon the facts as shown by his testimony that the appellant relies to show fraud and concealment used by the applicant. Dr. Hess testified that the insured called at his office in San Francisco on November 7, 1927 (which was more than two years after the attack of peptic ulcer for which Dr. Wright had treated him) and consulted him as a patient. A substantially complete statement of Dr. Hess' testimony follows: "He gave a history of having had ulcer of the duodenum with quite

a severe hemorrhage three years before he consulted me. He had some digestive disturbance and was afraid he might have a recurrence of the hemorrhage and ulcer. * * * He stated his reason for calling upon me was as a precaution, or for prophylactic treatment to prevent further trouble. He had no active disturbance at the time. I gave him the usual physical and chemical examination. * * * All I marked down is that he had some gas and indigestion. I might explain more why he worried. He spoke of his wife dying the spring before and he had been nervous and afraid of recurrence since then. He gave his slight indigestion as an additional reason for that fear. I think he had no pain. He did have some gas. * * * The examination was somewhat superficial, due to the fact that he gave a definite history of duodenal ulcer, and we took his word for that. I prescribed a diet and medicine. The principal tablet that we use as a preventive was one composed of magnesium oxide, * * * magnesium silicate, * * * soda bicarbonate, * * * and extract of nux vomica. * * * The purpose of that medicine was to correct hyperacidity. For active ulcer we put them to bed and keep them quiet. I would give the same medicine to correct hyperacidity of the system. Hyperacidity precedes ulcer. * * * I took X-rays of the abdomen, and they were negative. His first visit * * * he was in the office probably two or three times while he was in the city, over a course of several days. * * * I detailed a diet for his use. I always do that. I think most physicians now follow that policy, to prevent rather than cure. It is easier. If the ulcer was active we would put the patient to bed and give him a milk diet. * * * He was not confined to his bed or room. * * * He was down about his business when he came to see me. I told him to remain on this diet permanently. * * * He took considerable medicine away with him and then he came back the next year and got more.

"His next visit was September 11, 1928. The only symptom presented at that time, which I marked down, was gas. He stated he had been well during the year, quite well, which was why he came back for more medicine. * * * I gave him an additional supply of medicine. * * * He did not communicate with me between the first group of visits and the last group of visits. I had no correspondence with him. The last time he was probably in my office a couple of times. * * * Besides the tablets, he took some other liquid medicine. I did not give him a prescription from which he could purchase additional supplies. **I gave him the medicines, themselves.**

"I was prompted to give both the tablets and the diet from the history he gave me and not from anything I found by examination. The history was the ulcer occurring three years before. He looked well when he came down the second time, and in fact he was very well."

■ The proof made at the trial was that prior to his death, for a number of years, the insured had engaged actively in his business as a farmer and cattle raiser, and, as the wife of his stepson testified, he "rode after his own cattle"; that on the day that an agent of the insurance company came to deliver the policy the insured was in "fine health"; that on that day he had ridden after the cattle from 7:30 a. m. until about 8 p. m., riding a spirited horse; that he had done the same thing for years; that on the 25th of February, 1930, while riding in an automobile across a bridge, he met with an accident, receiving injuries from which he died.

A post mortem examination was held. Dr. Pius, county physician and health officer of Siskiyou county, performed the autopsy. In the course of his testimony at the trial, he said: "There was no evidence of scar tissue in either the stomach or duodenum, and I was very careful to look for it, because there was an old history of ulcer from relatives. I found no evidence whatsoever. I found the other interior organs normal. Everything was normal."

Dr. Wright, the examining physician for the insurance company, hereinbefore referred to, was also present at the post mortem examination. He testified as follows:

"Q. Were there any scar tissues such as would follow the result of an ulcer from the stomach, that you saw?

"The Witness. Not that we could discover. We found no scar tissue in the duodenum at the post-mortem. We could see no results of ulcer in either the stomach or duodenum at that time. * * * A peptic ulcer is the destruction of the mucous membrane of either the stomach or intestine. We could find no evidence of either the duodenum or the stomach mucous membrane, having been destroyed, previous to the post-mortem. * * * Scar tissue would show if peptic ulcer or duodenal ulcer had occurred; if the ulcers are of long duration. It is perfectly possible to have ulcer without the deep destruction of the walls, and in such case it will not leave scar tissue. My treatment of Kasshafer from March 21, 1925, to June 23, 1925, was not all

for peptic ulcer, partly I treated him for anemia, he was rather pale, and also for influenza. The first three weeks was for peptic ulcer, as I then thought it was."

It was sufficiently established that the insured at the time of his death was not suffering from any bodily disease, and that his death was due alone to the accident occurring while he was driving his automobile.

And we may pause here to dispose of the exceptions which appellant reserved to the rulings of the trial court in allowing proof to be made of the findings of the autopsy. The evidence was competent and material: First, because appellant had alleged (bill of complaint, par. 1) that, when the insured visited Dr. Hess, he was then suffering from, and was treated for, "pain and hemorrhage from duodenal, or peptic, ulcer," and this evidence was contradictory of that allegation; and secondly, it was competent and necessary for appellee, under his cross-complaint, to establish that death had resulted to the insured from bodily injury, effected "solely through external, violent and accidental means, * * *" before recovery on the accident clauses of the policy could be allowed.

 Having presented a résumé of the main facts which the trial developed, the question must be decided as to whether the insured withheld information from the insurer which was called for by the examining physician. The policy in this case contained the following provision: "This policy and the application therefor, a copy of which is attached hereto, constitute the entire contract between the parties; and no statement made by the Insured shall avoid this policy or be used in defense against any claim unless contained in a written application. *All statements made by the Insured shall, in the absence of fraud, be considered representations and not warranties."* (Italics supplied.)

Section 2605, of the Civil Code of California, provides that: "Every express warranty, made at or before the execution of a policy, must be contained in the policy itself, or in another instrument signed by the insured and referred to in the policy, as making a part of it."

Section 2610, of the same Code, reads as follows: "The violation of a *material warranty,* or other material provision of a policy, on the part of either party thereto, entitles the other to rescind." (Italics supplied.)

The Circuit Court of Appeals for the Eighth Circuit, in Bankers' Reserve Life Co. v. Matthews, 39 F.(2d) 528, 537, considered policies of insurance which contained the precise provision above quoted, with the exception only that the sentences of the clause were differently arranged. The court there said: "Under these policies, the statements in the applications are not warranties. They are representations. * * * Being representations, they do not void the contract, even though untrue in fact, provided they were honestly made in the belief by insured that they were true. That is, they must be both untrue and knowingly falsely made by insured. Whether any one of them was both untrue and falsely made is a question of fact to be determined from the evidence."

The insurer here expressly stipulated in its contract that all statements of the insured, in the absence of fraud, should be considered representations and not warranties. Under the conditions of the contract, the trial court had to determine as a fact, first, whether the insured purposely concealed the matter of his having consulted a physician not named by him at the time of the examination made by the medical officer who acted for the insurance company; and, second, whether the withholding of that information amounted to a misrepresentation under the contract conditions, the law considered. The insured, of course, knew that he had visited Dr. Hess. He knew also that the physician then interrogating him in behalf of the company had attended him for what the physician thought was peptic ulcer, more than three years prior to the time he signed the statement. It is to be noted that the question appearing in type upon the form which Dr. Wright filled in is in the singular number, where that question refers to consultation with a physician. The answer (written by the doctor) was in the affirmative, and referred to indorsements on the form as they appeared above that question where the statement was written describing the attack of peptic ulcer. By comparison, we find that the form which was used is different and less clear than the form considered in some of the cases, such as in Wharton v. Ætna Life Ins. Co., 48 F.(2d) 37 (C. C. A. 8), where the decision was against the insurer. There, after the question as to whether any physician had been consulted, in the blank following, appears: "Name and address of each, date, reason for consultation, examination or treatment."

Considering the fact that the insured had suffered from no active disease subsequent to the treatment given him by Dr. Wright for peptic ulcer in 1925, and that his answer in response to the question phrased in the singular number as to whether he had consulted

*any physician,* being truthfully given, it might reasonably be inferred that he had not understood that a statement as to his visits to Dr. Hess were required to be given at that time. We must keep in mind, too, that the very doctor acting for the company in filling in the answers on the blanks was the doctor who had treated the insured for the only active disease that he had had for a number of years prior to the date of the application. The fact has been noted that this physician, in a special report to the company, stated, using without doubt the special information that he had obtained by reason of his treatment of the insured, that at the time of the insured's examination he had, in the doctor's opinion, entirely recovered from his former ailment. To the question whether the insured had purposely, and with intent to deceive, failed to tell of his having visited Dr. Hess, the answer might reasonably be in the negative. The facts and circumstances considered, the findings of the trial judge on that issue should be sustained. The second question is thus reached:

 Was it obligatory upon the insured to disclose to the medical examiner acting for the insurance company the facts regarding his visits to Dr. Hess, considering his condition at the time of such visits? We think it may be deduced, as a rule governing insurance contracts of the kind considered, that, where it is clearly and explicitly so stipulated, every representation made by the applicant for a policy will be strictly considered as a warranty. In such a case, a state of forgetfulness, or a mistake, on the part of the applicant will not excuse the omission to furnish the information required; and this regardless of whether the withheld facts may appear to have affected the risk assumed. But, where the character of a *warranty* does not accompany the representations, and the fact appearing that the making of them could not reasonably have had material bearing to induce the insurer to enter into the contract, they will not affect the contract or give a right of rescission. Such is the trend of the many decisions found in the books. An answer from an applicant that he had never been rejected for insurance, when the fact was contrary, illustrates a case of the first kind, corresponding to the facts shown in the case of Mutual Life Ins. Co. v. Hilton-Green, 241 U. S. 613, 36 S. Ct. 676, 60 L. Ed. 1202. The decision of this court recently made in U. S. Fid. & Guar. Co. v. Leong Dung Dye, 52 F.(2d) 567 (opinion rendered September 15, 1931), involved a similar question. That case turned upon the question as to whether the insured had received a notice of rejection which the testimony tended to show had been mailed to him. Such was the narrow question presented, which the court resolved in favor of the beneficiary. It has been held by this court and others of the federal Courts of Appeals that an applicant for insurance, in answer to the question as to whether he has consulted a physician, is not required, at the risk of voiding his insurance for false representations if he fails so to do, to tell of consultation or treatment for slight or temporary indispositions, such as colds, insomnia, headache, constipation, or the like. Bankers' Life Co. v. Hollister, 33 F.(2d) 72 (C. C. A. 9); Wharton v. Ætna Life Ins. Co., 48 F.(2d) 37 (C. C. A. 8). And other decisions cited by the late Judge Rudkin in the case first above named.

In Connecticut Mut. Life Ins. Co. v. Union Trust Co., 112 U. S. 250, 5 S. Ct. 119, 123, 28 L. Ed. 708, an applicant for insurance had answered to a question as to whether he had suffered from diseases, including "affection of liver," "No." The trial court had refused an instruction to the jury that, if it believed the insured ever had had an affection of the liver, his policy would be void. The trial court did instruct as follows: "That disease implied a substantial attack of illness, or a malady, which had some bearing on the general health of the insured, not a slight illness, or temporary derangement of the functions of some organ."

The Supreme Court of the United States found that the offered instruction was properly refused, saying: "Upon its appearing simply that the insured, prior to his application, had experienced a slight, temporary affection of the liver which had no tendency to shorten life, and all the symptoms of which had disappeared, leaving no trace whatever of injury to health." Adding: "It was not contemplated that an insured would recall every instance of illness affecting the liver which lasted only for a brief period, and was unattended by substantial injury, or inconvenience, or prolonged suffering. Unless he had an affection of the liver that amounted to disease, that is, of a character so well-defined and marked as to materially derange for a time the functions of that organ, the answer that he had never had the disease called 'affection of the liver' was a 'fair and true' one; for, such an answer involved neither fraud, misrepresentation, evasion, nor concealment, and withheld no information as to his physical condition with which the company ought to have been made acquainted."

■ At the time of insured's first visit to Dr. Hess, he was, as the doctor testified, not suffering from peptic ulcer, and there were no symptoms of that disease present. He complained of indigestion and gas in the abdominal region, and the doctor's remedies, given to him at the office, were, as the physician said, preventive only; they were of rather simple form, and were such as he would have given to correct a commonly found overacid condition. The insured had stated, the answer appearing on the form which the examining physician filled in, that he had had dyspepsia and indigestion. So the company was not misled as to those matters at all. At the time Dr. Wright treated the insured in 1925, the symptoms which prompted his diagnosis of peptic ulcer were pronounced; there was pain and hemorrhage from the intestinal tract. None of these symptoms existed when Dr. Hess made his examination, and at the post mortem examination of the body of the insured no evidence was found of any ulcerous condition; neither was there a trace or scar of any ulcer that had previously existed. The case presented was very different from those cases where the applicant for insurance failed to disclose the fact of his having consulted with a physician for a disease which such consulting physician found to be of an active nature. Receiving preventive treatment to forestall the possible recurrence of a disease from which a man has apparently recovered is entirely different from consulting a physician on account of a malady then actively present.

We conclude that the trial judge did not err in his rulings made during the trial, nor in his decision of the case.

Judgment affirmed.