**EDWARDS et al. v. UNITED STATES.**

No. 9584.

Circuit Court of Appeals, Sixth Circuit.

Feb. 7, 1944.

W. B. Hale, of Rogersville, Tenn., and F. H. Parvin, of Greeneville, Tenn., for appellants.

Keith L. Seegmiller, of Washington, D. C. (James B. Frazier, of Chattanooga, Tenn., Francis M. Shea, Lester P. Schoene, Wilbur C. Pickett, and Fendall Marbury, all of Washington, D. C., on the brief), for appellee.

**527**

Before SIMONS, HAMILTON, and MARTIN, Circuit Judges.

HAMILTON, Circuit Judge.

This is an action upon a government insurance policy in the principal amount of $10,000.00 upon the life of Charles P. Edwards, which matured by his death. Appellant, Charles P. Edwards, Jr., was named therein as sole beneficiary and if the policy was void he was entitled to recover premiums in the sum of $4,374.20 paid thereon.

April 23, 1937, the insured, a practicing physician of Asheville, North Carolina, signed applications on forms furnished by the Veterans' Bureau to reinstate yearly renewable term insurance policies on his life in the aggregate amount of $10,000.00 which had lapsed February 1, 1920, and which were issued to him by the Government during his military service in the first World War, and when reinstated to convert such insurance to a contract of United States Government life insurance, naming Charles P. Edwards, Jr., beneficiary. The application for reinstatement was accompanied by a medical examination report made by a physician who was dead at the time of the trial. The insured was recommended as an insurable risk under the statute and regulations covering government life insurance and the reinstatement of lapsed policies. The application, among others, contained three questions which it is claimed the applicant knowingly answered falsely. These questions and answers are as follows:

"7. Have you . . . contracted any dissease . . . since lapse of this insurance?

"No.

"10. Are you now in good health?

"Yes.

"11. Have you ever been treated for any disease of . . . heart, or blood vessels?

"No. Kidneys? No."

The questions were preceded on the application by the following statement:

"I do hereby certify that the answers to the following questions are true to the best of my knowledge and belief, and are made as of the day on which the application is submitted to the bureau or deposited in the United States mail."

The applications were mailed to the Regional Office of the Veterans' Bureau at Nashville, Tennessee, where they were received May 4, 1927, and forwarded by the

Regional Office to the Central Office at Washington, D. C., where they were received May 6, 1927. The Veterans' Bureau notified the applicant by letter of June 2, 1927, that his applications had been approved and the converted policy applied for mailed and that it became effective as of May 1, 1927. On May 6, 1927, the insured went to Johns Hopkins Hospital for the purpose of a diagnostic examination and consulted Dr. Louis E. Hamman, a professor of medicine at Johns Hopkins Medical School and a visiting physician at the hospital, who was also engaged in private practice. In giving his case history, the insured stated that he had found albumin in his urine and that his blood pressure was elevated and that in 1924 he had a severe septic throat and albumin in his urine in large amounts. He said that at that time he had his tonsils removed and thereafter the albumin slowly disappeared and that his systolic blood pressure during that period varied from 140 to 150. He also stated that before he had his tonsils removed, he had frequently suffered from tonsillitis. He stated he had been subject to frequent headaches which had been more severe in the two months preceding the examination and that within the same period the albumin in his urine had increased and that he had had his teeth X-rayed finding six of them abscessed and that after they were removed the amount of albumin decreased, but that his blood pressure had been running a systolic of between 165 and 170.

Dr. Hamman, on his examination over a period of two days, found insured had systolic blood pressure of 178 and diastolic of 116. He also found a trace of albumin and a few hyaline casts in the urine but no serious disturbance of the function of the kidneys. The doctor diagnosed the insured's condition as "so-called essential hypertension" which is an idiomatic phrase describing high blood pressure for which no cause can be found.

In January 1933, the insured filed with the Veterans' Administration, a sworn application for compensation as a disabled veteran, claiming his disability had occurred while in the military service. As a basis for his claim he stated in his affidavit that he had a cardiorenal disability which began September 1918, and was the aftermath of a severe attack of influenza and tonsillitis. There was attached to insured's affidavit a letter of explanation in which he stated that following the attack of influenza and tonsillitis (for which he had treated himself) he suffered from dizziness, slight headaches and a heart irregularity, which disturbed his sleep. He stated that at that time he consulted the chief of the medical service at the hospital in France where the insured was stationed, who told him that if his condition did not improve a recommendation for discharge would be made and he was discharged in March 1919. The insured stated that he then returned to Kingsport, Tennessee, and resumed his medical practice specializing in surgery, but that his physical ailments continued and that he consulted Dr. E. W. Tipton of Kingsport, who, on examination, found insured's blood pressure was 160 systolic and 100 diastolic and he also found albumin in his urine. The insured stated that notwithstanding his physical disability, he continued his practice until November or December 1919, during which time he consulted Dr. P. E. Marsh also of Kingsport who found his blood pressure to be 170 over 100 and that insured concluded from Dr. Marsh's report that he had something seriously wrong physically and would have to engage in lighter work and for this purpose in January 1920, he gave up the practice of surgery, moved from Kingsport, Tennessee, to Asheville, North Carolina, where he practiced as an eye, ear, nose and throat specialist. He stated that after he had been in Asheville three or four years without any improvement in his physical condition, he consulted Dr. Louis E. Hamman, whose diagnosis we have heretofore outlined.

In support of insured's application for compensation, he filed a certificate of Dr. E. W. Tipton, reciting inter alia that he had advised insured in 1919 due to his physical condition not to return to surgery, but to do some special work, which would allow him regular hours for work and rest.

At the trial, Dr. Tipton repudiated the above statement and said that Dr. Edwards was his partner in the practice of medicine and that occasionally they and other doctors associated with them checked each other's physical condition and on one of these examinations, immediately after insured's return from the army, he did have accelerated blood pressure, but that it was temporary and returned to normal within a few days. He said his statement that insured was a chronic sufferer from arteriosclerosis was a clear error and that he was sorry it was in his statement and that he

could give no reason for making it, except the friendship he had for insured.

Insured also filed a certificate from Dr. Hamman in which, among other things, it was stated that in May 1927, as a result of his physical examination of insured, he had advised him to reduce his professional activities; that his condition at that time, although not extreme, was chronic and progressive. In February 1933, and again in April 1937, insured stated to the examining physicians of the Veterans' Administration in connection with his claim for compensation that he had been suffering from high blood pressure and albumin in his urine while in the service and ever since.

The insured in 1936 or 1937 had a slight cerebral hemorrhage and died October 6, 1938, the immediate cause of death not shown in the record. Insured was examined by Dr. Arthur F. Reeves on November 21, 1921, for life insurance and in his report Dr. Reeves showed the insured's blood pressure to be normal, no albumin and no disease or ailment. On March 26, 1924, the insured was examined on another life insurance application by Dr. P. E. Marsh who reported at that time that the insured's blood pressure was normal, that he was free from albumin and had no disease. Marsh and Reeves were dead at the time of the trial.

Dr. J. G. Anderson, of Asheville, North Carolina, on April 23, 1927, examined insured and made a medical report on which the present policy was issued. In his report Dr. Anderson stated that insured was free from disease, with blood pressure systolic of 150 and diastolic of 85 and with no albumin in his urine. Dr. Anderson also was dead at the time of the trial.

Dr. T. B. Yancey examined the insured soon after his return from France and again in 1932 and testified that in the first examination he found a trace of albumin in the urine but that after three or four days he made another test and found the urine without any albumin and that he found his blood pressure normal on the first examination. He stated that when he examined the insured in 1932 he found his blood pressure normal for his age.

Drs. Tipton, Wilson and Yancey testified that in their opinion, assuming that the history given by the insured to Dr. Hamman was true and that Dr. Hamman's diagnosis was correct, these facts did not show that insured was suffering from any organic disease at that time. Each of these doctors testified that high blood pressure often is temporary and results from excitement or various conditions and that its permanency could not be determined from a single test which was all Dr. Hamman made. Dr. Wilson testified that excitement or exertion might cause the blood pressure temporarily to rise as much as from 20 to 30 points. The military record as kept by the War Department during insured's service, showed that while in the service, he was free from disease or illnesses of any kind. Professional associates of the insured, his family and social friends who saw and conversed with him almost daily from the date of his discharge from the Armed Forces until the policy reinstatement and subsequently, testified that the insured appeared to each of them to be in perfect health and each stated that he never heard the insured complain of any illness and that he led an active professional life and played golf regularly, at times playing thirty-six holes.

Based on the evidence here detailed, at the close of the testimony in the trial court the Government moved for a directed verdict in its favor. The court withheld a ruling on the motion under Rule 50(b) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, and submitted the case to the jury which returned a general verdict for appellant. The Government then moved for a judgment notwithstanding the verdict. The trial court sustained the Government's motion for a judgment non obstante and dismissed appellant's petition, solely on the ground that the insured was afflicted with a serious disease at the date of the policy and that insured knew that fact at the time he filed his application for reinstatement and he concealed it for the purpose of defrauding the insurer. Appellant moved that the judgment be set aside and that he have a judgment on the verdict of the jury or in the alternative a new trial. The latter motion was overruled and from these orders this appeal is prosecuted.

Appellant insists that considering the evidence most favorable to him and all reasonable inferences therefrom in his favor, the issue was for the jury and the cause should be reversed with directions to enter a judgment in his favor on the verdict of the jury and to set aside the order dismissing his petition.

The World War Veterans' Relief Act, 38 U.S.C.A. § 512a, provides that any person

who had, prior to May 9, 1928, applied, or been eligible to apply, for yearly renewable term insurance or United States Government life insurance and whose policy had lapsed could, on application, have it reinstated provided that such person was in good health and furnished to the administrator of veterans' affairs satisfactory evidence to that effect.

■ The same Act, 38 U.S.C.A. § 518 provides that all contracts, or policies of insurance issued, reinstated or converted shall be incontestable from date of issuance, reinstatement or conversion, except for fraud or other grounds not material here. Insurance contracts under the War Risk Act are to be construed by the same rules as like contracts involving private parties. Kontovich v. United States, 6 Cir., 99 F.2d 661.

In order to void a policy for fraud there must be present in the evidence facts about which reasonable minds cannot differ, showing that the insured made a false representation, (a) in reference to a material fact, (b) with knowledge of its falsity, (c) the intent to deceive, and (d) action taken in reliance upon the representation. Pence v. United States, 316 U.S. 332, 338, 62 S.Ct. 1080, 86 L.Ed. 1510; Claflin v. Commonwealth Ins. Co., 110 U.S. 81, 96, 3 S.Ct. 507, 28 L.Ed. 76.

■ An application for life insurance which becomes a part of the policy must be construed in the light of its purpose and like other papers preliminary to a written contract, the words and phrases used apply according to their ordinary sense. The meaning of two of the questions which appellee claims insured answered falsely may be considered together. The first was whether the insured, since the lapse of the policy, had contracted any disease; and the other, was the insured in good health at the time he applied for reinstatement?

The first question relates to the period of time from February 1, 1920, to May 4, 1927, and the second question relates to the time the application was filed. The evidence on which appellee relies must be applied in the light of what is meant by "contracted disease" or "good health." The health of an applicant for insurance upon his life is of vital importance to the insurer and the questions to elicit information on the subject in regard to the illnesses and ailments of an applicant should be truthfully answered. The terms with which we are concerned have long been the subject of judicial definition and they have acquired reasonable definite meanings in the insurance business.

■ An illness, even though curable only by medical or surgical treatment, but nevertheless, readily remediable, and so not necessarily tending to shorten life before it has become so far developed as to have some present bearing upon the general health is not a "disease" as one would ordinarily understand that term; and a local affection is not a local disease within the meaning of a warranty in a policy of insurance unless such affection has sufficiently developed to have some bearing upon the general health.

■ The term "good health" does not mean absolute perfection, but is comparative. An insured need not be entirely free from infirmity or from all ills to which flesh is heir. If he enjoys such health and strength as to justify the reasonable belief that he is free from derangement of organic functions, or free from symptoms calculated to cause a reasonable apprehension of such derangement and to ordinary observation and outward appearance, his health is reasonably such that he may with ordinary safety be insured and upon ordinary terms, the requirement of good health is met. Slight troubles, temporary and light illnesses, infrequent and light attacks of sickness, not of such character as to produce bodily infirmity or serious impairment or derangement of vital organs do not disprove the warranty of good health. In other words, the term good health, when used in a policy of life insurance, means that the applicant has no grave, important or serious disease, and is free from any ailment that seriously affects the general soundness and healthfulness of the system. Connecticut Mut. Life Ins. Co. v. Union Trust Co., 112 U.S. 250, 257, 5 S.Ct. 119, 28 L.Ed. 708; Zogg v. Bankers' Life Co., 4 Cir., 62 F.2d 575; Manhattan Life Ins. Co. v. Carder, 4 Cir., 82 F. 986; Combs v. Equitable Life Ins. Co., 4 Cir., 120 F.2d 432; Manufacturers' Accident Indemnity Co. v. Dorgan, 6 Cir., 58 F. 945, 22 L.R.A. 620; Black v. Travelers' Ins. Co., 3 Cir., 121 F. 732, 61 L.R.A. 500; Penn Mut. Life Ins. Co. v. Mechanics' Savings Bank & Trust Co., 6 Cir., 72 F. 413, 38 L.R.A. 33; Ocean Accident & Guaranty Corporation v. Rubin, 6 Cir., 73 F.2d 157, 96 A.L.R. 412.

■ The question of whether an applicant has been treated for any disease of the heart, kidneys or blood vessels connotes

treatment by a physician for a serious or severe ailment involving these organs, such as would affect the contract of insurance. It does not include consultation with a physician or a physical examination for the purpose of determining whether or not the person is afflicted with a disease in any of these bodily organs. Kaplan v. Manhattan Life Ins. Co. of New York, 71 App. D.C. 250, 109 F.2d 463; Atlantic Life Ins. Co. v. Stringer, 5 Cir., 28 F.2d 665; Security Life Ins. Co. v. Brimmer, 8 Cir., 36 F.2d 176; Pilot Life Ins. Co. v. Dickinson, 4 Cir., 93 F.2d 765; Northern Life Ins. Co. v. King, 9 Cir., 53 F.2d 613; Wharton v. Ætna Life Ins. Co., 8 Cir., 48 F.2d 37; Golightly v. New York Life Ins. Co., 8 Cir., 85 F.2d 122.

The evidence on the blood pressure of the insured is contradictory. Some of the witnesses who testified stated it was high, others stated it was normal. All of the experts testified that the blood pressure of insured, standing alone, was not a disease and none of the witnesses testified there was any diseased condition of insured's arteries or kidneys. Some of the physicians testified that the insured's blood pressure was due to the diseased condition of his tonsils and abscessed teeth and that it became normal after they were removed. The same is true of albumin found in insured's urine.

There is evidence in the record from which the inference could be drawn that insured believed himself to be in good physical condition at the time he filed the application in question and received the insurance policy. There is likewise evidence from which an inference could be drawn that he was in fact in good health. The physician who examined insured for the purpose of reinstatement of the policy, reported he was in good physical condition and a good risk.

The work a man does, its continuity and length is some evidence of his physical condition. There is no dispute that insured for more than ten years after the issuance of the contested policy, actively and constantly engaged in the practice of his profession and those who knew him best and saw him frequently testified he appeared to be in perfect physical condition and none of them heard him complain of illness or physical impairment.

■ In all actions to set aside contracts on the ground of alleged fraud, the rule is that the evidence tending to prove the fraud must be clear and satisfactory. A mere preponderance of evidence which is somewhat vague or ambiguous is insufficient to support a judgment, and this rule applies to alleged fraudulent representations made to an officer of the Government upon which the officer makes a contract or does any other official act. Lalone v. United States, 164 U.S. 255, 257, 17 S.Ct. 74, 41 L.Ed. 425.

■ While courts should not hesitate to take from juries matters of fact which are clearly not in dispute, they should be careful not to invade the province of the jury. It is not in the power of a jury to bestow charity at the Government's expense and where it clearly appears that this is done, the trial court should set aside the verdict.

■ However, judging the proof here by the standards set down and viewing it as a whole, we cannot say the evidence preponderates so heavily for appellee as to leave no dispute about the facts or the inferences to be drawn therefrom. The question of insured's fraud on the appellee was for the jury. Manhattan Life Ins. Co. v. Francisco, 84 U.S. 672, 680, 21 L.Ed. 698; Moulor v. American Life Ins. Co., 111 U.S. 335, 346, 4 S.Ct. 466, 28 L.Ed. 447. The trial court relied on the case of Pence v. United States, supra, in dismissing appellant's petition and appellee insists here that that case is conclusive. There are shades of differences between the cited case and the one at bar, which place the latter without the bounds of the former. In the Pence case the applicant for the insurance was a physician and medical officer in the military service of the United States. While in the service he obtained a War Risk term insurance policy which lapsed February 1, 1920. On June 21, 1927, Pence applied for a reinstatement and conversion of the lapsed policy. In his application for reinstatement he categorically denied he had been treated for any of the diseases about which inquiry was made. Pence also denied he had been treated by a physician, been ill, or prevented by ill health from following his usual occupation. On October 9, 1931, Pence filed an application for compensation in which he stated that he was disabled while in the service by several of the diseases which he had theretofore stated in his application for reinstatement of the insurance, that he had not had. Pence also stated he had been confined to bed and likewise to a hospital by his illnesses from

532

these diseases. The only evidence in the record to contradict any of the statements of the applicant was the testimony of his wife that she knew nothing about these illnesses and that her husband had led an active, vigorous life and that he was never confined to bed except by occasional colds and that he suffered no other sicknesses. Insured's two sons and two friends also testified to his active life and apparent good health. The court said (316 U.S. at page 340, 62 S.Ct. at page 1084, 86 L.Ed. 1510): "No evidence in the case served in any way to contradict, qualify, or explain Pence's admissions. We are of opinion that in the absence of any such evidence his admissions established so overwhelming a case in favor of the Government as to require the direction of a verdict in its favor * * *."

There is evidence in the case at bar which contradicts the statements made by the insured in his application for compensation and also the statements he made to Dr. Hamman. The evidence which the court said in the Pence case was absent and which, if present, would have required the submission of the question of fraud to the jury, is found in the case at bar.

Appellant has urged on us that the admission in evidence of the statements of the insured in his application and supporting papers for compensation was error, and that the trial court's conclusion that appellee was entitled to retain the premiums paid on the policy has no support in law. In view of the disposition of the case, we find it unnecessary to pass on these points.

█ Appellee's sole contention in the trial court was that the evidence so clearly and unmistakably showed that insured was guilty of fraud in the procurement of the policy in suit as to leave no question of fact for the jury to decide. This made the issue one of law. Appellee relies on no error occurring in the course of the trial and makes no objection to the instructions given by the court. Under Rule 50(b) where there is a motion for a judgment non obstante veredicto and in the motion there are no errors assigned, the disposition of which is lodged in the trial court's discretion, the Circuit Court of Appeals has the power finally to dispose of the case. Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 250, 61 S.Ct. 189, 85 L.Ed. 147.

The judgment is reversed and the cause remanded to the district court with directions to set aside the order dismissing ap-pellant's petition and to enter a judgment for appellant pursuant to the verdict of the jury.