KAMMER v. UNITED STATES.

Civ. A. No. 4071.

United States District Court
M. D. Pennsylvania.

Oct. 3, 1952.

Arthur Silverblatt, Wilkes-Barre, Pa., for plaintiff.

Arthur A. Maguire, U. S. Atty., Scranton, Pa., for defendant.

WATSON, Chief Judge.

This is an action on a National Service Life Insurance policy issued under the National Service Life Insurance Act of 1940, as amended, 38 U.S.C.A. § 801 et seq. Mrs. Frances Kammer, the named beneficiary in the policy, seeks to recover the proceeds of a policy issued to her deceased husband, Frank Kammer.

Upon agreement of counsel and the plaintiff herself, the case was heard by the Court without a jury. The Court makes the following findings of fact and conclusions of law:

Findings of Fact

1. Frank Kammer, deceased, was born in Germany on December 31, 1907, and received his education in Germany. He was married in 1936 and came to the United States in 1939.

2. Kammer entered the Armed Forces of the United States on November 6, 1943.

3. Upon application he was granted a $10,000 National Service Life Insurance policy on the Five Year Level Premium Term Plan, effective November 8, 1943, as evidenced by Contract No. N 1464 94 19.

4. The plaintiff, Frances Kammer, is the widow of Frank Kammer and is the beneficiary named in said insurance policy.

5. The insured was honorably discharged from the United States Army on January 11, 1946.

6. This policy lapsed for failure to pay the premium due on March 8, 1946.

7. On June 26, 1946, the insured executed an application for reinstatement on VA Form 353(a), and tendered two monthly premiums therewith in the amount of $15.40.

8. The application for reinstatement, among other things, contained the following questions and the insured's answers thereto:

"(1) Are you now in as good health as you were on the due date of the first premium in default? (Answer 'yes' or 'no') Yes.

"(2) Have you been ill, or suffered or contracted any disease, injury or infirmity, or been prevented by reason of ill health from attending your usual occupation, or consulted a physician, surgeon, or other practitioner for medical advice or treatment at home, hospital, or elsewhere, in regard to your health, since lapse of this insurance? (Answer 'yes' or 'no') No.

(If 'yes' give all dates and full particulars, including the name and address of practitioner and attach to this application a certificate of the practitioner or head of the hospital where treated, with diagnosis, prognosis, and treatment if available)."

9. The application for reinstatement was approved by the Veterans' Administration and the insurance was reinstated as of June 8, 1946.

10. On January 21, 1947, the insured converted his term insurance to a 20-Year Endowment policy, retroactive to November 8, 1943, which was the original effective date of the term insurance.

11. In order to make the policy retroactive to November 8, 1943, the insured was required and did pay an initial remittance of $1315.10 to the Government at the time of the conversion.

12. Monthly premiums on the converted policy in the amount of $35.80 were timely paid from the date of conversion to February 7, 1949, or until a date subsequent to the insured's death.

13. The insured died February 4, 1949, at the Nesbitt Memorial Hospital, Kingston, Pennsylvania, from poison, apparently self-administered.

14. The Veterans' Administration refused to pay plaintiff the proceeds of the policy.

15. After the insured was discharged from the Army on January 11, 1946, he returned to his home in Kingston, again followed his occupation as an exterminator, did not complain of any physical ailments, and appeared to be physically well.

16. The insured, however, did experience difficulty in adjusting himself to civilian life and to his business, appearing depressed and confused.

17. His wife, the plaintiff in this action, consulted Mrs. Long, a social worker and head of the Jewish Welfare Agency in Wilkes-Barre, and told her of the insured's difficulties.

18. Mrs. Long advised the plaintiff to have insured consult Dr. J. Franklin Robinson, a doctor in Wilkes-Barre whose practice is limited to psychiatry and neurology.

19. After repeated requests by plaintiff and Mrs. Long the insured reluctantly agreed to. and did visit Dr. Robinson on June 20, 1946.

20. Dr. Robinson is an Executive Director of the Children's Service Center, a social agency, and has his office in its building. His name does not appear on the office door.

21. The insured's visit to Dr. Robinson on June 20, 1946, lasted about 40 minutes. Dr. Robinson also spoke to Mrs. Kammer for about 5 minutes. The visit consisted of a conversation in which the insured did most of the talking, except for an occasional question by Dr. Robinson. There was no physical examination of the insured, nor was any medical history taken. The insured insisted he was not ill, that his trouble was anxiety, that he was selfish, and that he felt guilty because he would not go to work the previous month. At this first visit Dr. Robinson had not formed an opinion as to whether the insured was suffering from a mental disease. He merely concluded that the man was troubled and had on occasion considered the possibility of suicide. Dr. Robinson did not tell the insured he was ill. No medications were prescribed, but the Doctor suggested that the insured visit him at regular scheduled interviews. The insured was very reluctant, but agreed to visit him one week later, June 27, 1946.

22. The insured visited Dr. Robinson again on June 27, July 9, July 16, July 19 and July 21, 1946, all of which took place after the insured had filed his application for reinstatement.

23. As late as July 22, 1946, Dr. Robinson expressed a great deal of reservation in his diagnosis of insured's condition, but his final diagnosis was one of manic depressive psychosis, depressed type. In late July of 1946, Dr. Robinson recommended hospitalization, and the insured was admitted to the Valley Forge General Hospital on July 30, 1946.

24. The Court finds that the insured's answers to the questions on the application for reinstatement were not made with an intent to deceive and defraud the Government.

## Discussion

The Government has interposed the defense of fraud on the ground that the insured knowingly answered falsely two of the questions contained in the application for reinstatement of his National Service Life Insurance policy. These questions and answers are as follows:

"(1) Are you now in as good health as you were on the date of the first premium in default? (Answer 'yes' or 'no') Yes.

"(2) Have you been ill, or suffered or contracted any disease, injury or infirmity, or been prevented by reason of ill health from attending your usual occupation, or consulted a physician, surgeon, or other practitioner for medical advice or treatment at home, hospital, or elsewhere, in regard to your health, since lapse of this insurance? (Answer 'yes' or 'no') No."

The defense of fraud is an affirmative defense which places the burden of proof on the Government. Danaher v. United States, 8 Cir., 1950, 184 F.2d 673. In an action to set aside an insurance contract on the ground of alleged .fraud, the rule is that the evidence tending to prove the fraud must be clear and satisfactory and a mere preponderance of evidence which is somewhat vague or ambiguous is insufficient. Edwards v. United States, 6 Cir., 1944, 140 F.2d 526.

The necessary elements for the defense of fraud are (1) a false representation (2) in reference to a material fact (3) made with knowledge of its falsity (4) with intent to deceive and (5) with action taken in reliance upon the representation. Pence v. United States, 316 U.S. 332, 338, 62 S.Ct. 1080, 86 L.Ed. 1510.

As to the first question, the representation made by the insured that he was in as good health on the date of the application for reinstatement as he was on the due date of the first premium in default merely expressed an opinion. There is nothing in the record to suggest that his opinion was otherwise. During his visit to Dr. Robinson on June 20, 1946, which was only 6 days prior to his application for reinstatement, he insisted that he was not ill, and Dr. Robinson did not tell him that he was ill. His wife also testified that he had never complained of being ill. It is clear that the insured did not knowingly make a false representation.

The second question which the insured was asked to answer actually consisted of three questions, to all of which a "yes" or "no" answer was requested, and the insured answered "no". The first part of the question reads, "Have you been ill, or suffered or contracted any disease, injury or infirmity since lapse of this insurance"? In answering "no" to this question the facts do not show that the insured knowingly made a false representation, because he never complained of being ill and insisted that he was not ill when he visited Dr. Robinson. There is nothing in the record to indicate that he knew that he was ill.

The second part of the question reads, "Have you been prevented by reason of ill health from attending your usual occupation since lapse of this insurance"? The only evidence introduced at the trial indicating that the insured did not follow his occupation during the period of time in question was Dr. Robinson's testimony that at the time of insured's first visit he stated that he was feeling guilty because he would not go to work during the previous month. There is nothing in the evidence, however, which shows that he failed to go to work because of ill health. To the contrary, there is evidence to indicate that he was dissatisfied with his work as an exterminator, and at one time he quit his work as an exterminator and secured a job in a dress factory for six weeks. As to this part of the question, the Court cannot find that the insured made a false representation with knowledge of its falsity and with intent to deceive.

The third part of the question reads, "Have you consulted a physician, surgeon, or other practitioner for medical advice or treatment at home, hospital, or elsewhere,

in regard to your health, since lapse of this insurance"? It is admitted that the insured made one visit to Dr. Robinson subsequent to the lapse of his insurance and prior to his application for reinstatement, and so the first element of fraud, a false representation is present. Plaintiff also conceded that such a representation was material as a matter of law, and that action was taken by the Government in reliance thereon. It is plaintiff's contention, however, that the record fails to show that the representation was made wtih knowledge of its falsity and with intent to deceive.

From the evidence introduced it is possible to draw the inference that insured at the time of his first visit did not know that Dr. Robinson was a physician. Dr. Robinson is a psychiatrist and testified that many of his patients did not know he was a doctor, and that his office was unlike a usual doctor's office in that it is located in a building owned and occupied by a social agency and his name does not appear on his office door. It is more reasonable, however, to conclude that the insured did know that Dr. Robinson was a physician. He was a well educated man, and prior to the visit of June 20 his wife and Mrs. Long had spoken to him about Dr. Robinson and the advisability of consulting him.

But the fact that the insured knew that he had visited a physician and failed to disclose the same does not in itself establish fraud. An applicant for insurance is not required to disclose the fact of consulting a physician for slight or temporary ailments such as an ordinary cold, inability to sleep, constipation, headaches, grippe, indigestion, etc. Danaher v. United States, 8 Cir., 1950, 184 F.2d 673 supra; Adams v. Metropolitan Life Insurance Co., 322 Pa. 564, 186 A. 144. A reasonable construction must be placed on the terms "consulted a physician" or "being attended by a physician", just as is given to the statement that the applicant is in "sound health" or "good health". In such case it does not mean absolute perfection of health, but only that the applicant has no grave, important or serious disease and is free from any ailment that seriously affects the general soundness and healthfulness of the system. McBride v. Sun Life Insurance Co., 1926, 90 Pa.Super. 35.

Though it is true that Kammer may have had a very serious mental condition on the date of his visit to Dr. Robinson, there is nothing in the evidence to indicate that such fact was known to him, or even to Dr. Robinson at that early date. Dr. Robinson testified that at this first visit he had not formed an opinion as to whether insured was suffering from a mental disease. He merely concluded that the man was troubled and had on occasion considered the possibility of suicide. As late as July 22, 1946, almost one month after the application was filed, the doctor still expressed a great deal of reservation in his diagnosis. At this visit, there was no physical examination and no treatment or medicine was prescribed. The entire interview consisted of a conversation in which the insured did most of the talking. He insisted he was not ill and though he did agree to return in a week, he did so very reluctantly.

The facts of this case are much akin to those present in Cardwell v. United States, 5 Cir., 1951, 186 F.2d 382, wherein the insured had given the same answers to the identical questions which were put to Kammer in the instant case. Cardwell, however, had consulted two doctors at various times prior to his application for reinstatement, complaining of abdominal pains, loss of weight and nervousness. One doctor said there was nothing physically wrong with the insured and the other attributed the pain to a simulated appendix. After his policy was reinstated, an appendectomy was performed and it was discovered that he had a perforated cancer of the bowel. Thereafter he applied for a pension and disclosed that he had been treated for stomach trouble by one of the above doctors. He died shortly thereafter. The district court granted defendant's motion for directed verdict on the ground of fraud, but the circuit court reversed. The court pointed out that the insured was a layman, a carpenter, who did not know that he had a serious disease, and that it was not un-

reasonable to infer from the evidence that the applicant, in good faith, did not consider his visits to the doctor of sufficient importance to report them, if indeed, he had this detail in mind when he signed the prepared application for reinstatment. The court held that the question of insured's fraud was for the jury and not the court.

In Adams v. Metropolitan Life Insurance Co., 322 Pa. 564, 186 A. 144, supra, the insured had visited her physician 15 times during a period of slightly more than 3 months prior to her application for insurance and failed to disclose the same when asked the question, "Have you been attended by a physician during the last 5 years"? During these visits she was actually being treated for an inflammation of the kidney, but this was not disclosed to her by her doctor. She believed she was being treated for headaches. The Supreme Court of Pennsylvania held that in view of the fact that she was unaware of the existence of any organic disease or serious disorder, it was for the jury to say whether or not she was guilty of bad faith in answering the question as she did.

The Government relies chiefly upon Pence v. United States, 316 U.S. 332, 62 S.Ct. 1080, 86 L.Ed. 1510, supra, wherein the Supreme Court sustained the Government's motion for an instructed verdict. In the Cardwell case the Court of Appeals for the 5th Circuit distinguished the Pence case on its facts, and it may also be distinguished from the instant case. Pence had been a physician in the military service of the United States; his policy lapsed in 1920, and in his application for reinstatement in 1927 categorically denied that he had been treated for any disease of the throat, heart or stomach, that he had consulted a physician, or had been ill since the lapse of his policy. However, in an application for compensation filed in 1928, Pence stated that in 1918 an Army doctor had told him that his heart was shot and he had severe gastric upset, which was the forerunner of duodenal ulcer which perforated in 1920 and again in 1925. In 1925 he received a gastro-intestinal X-ray which resulted in a diagnosis of suspected duodenal pathology. In addition there was also evidence of treatment by other physicians for myocarditis and sinusitis. The Supreme Court observed that his admissions left no room for conjecture as to the falsity of the representations and of the knowledge of such falsity and on the basis of these facts held that the requisite intent to defraud would be presumed and therefore need not be proven in the absence of countervailing evidence.

That the Pence case in no way controls the present case is readily apparent. Pence was a physician with full knowledge of his physical condition and the import of the questions. Kammer was a layman who, understandably, felt he was not ill, but merely believed his trouble to be one of adjustment to his business and family life after a tenure of service in the Army. As in the Cardwell case, it is reasonable to infer from the evidence that Kammer, in good faith, did not consider his visit to the doctor of sufficient importance to report it, if indeed, he had the visit in mind when he signed the application for reinstatement.

The Government also relies on the recent case of McDaniel v. United States, 5 Cir., 1952, 196 F.2d 291, but it too may be distinguished on its facts from this case. Subsequent to the lapse and prior to reinstatement, McDaniel made several visits to a doctor for throat and gland trouble, and the doctor made X-rays and recommended an operation. Later he made numerous visits to two other doctors for examination and X-ray treatments. A needle biopsy was performed and a diagnosis of "Probable Hodgkins Disease" was made. Though he was not told that he had Hodgkins disease, he knew from what the doctors told him and the treatments he received that he was seriously disabled and on that basis had applied for and received a seventy per cent disability compensation rating. The court very properly distinguished the Cardwell case and entered judgment for the defendant.

Under the facts of the instant case, the intent to deceive cannot be presumed from the false representation, rather it is for the Court sitting as a jury to determine whether Kammer had made a false representa-

tion with knowledge of its falsity and with intent to deceive. From the evidence, the Court finds that the insured had no intention of deceiving and defrauding the Government, and, therefore, finds for the plaintiff and against the defendant.

### Conclusions of Law

■ 1. The defense of fraud is an affirmative defense and the burden is on the defendant.

■ 2. In an action to set aside an insurance contract on the ground of fraud, evidence tending to prove the fraud must be clear and satisfactory and a mere preponderance of the evidence which is somewhat vague or ambiguous is insufficient.

■ 3. The necessary elements for the defense of fraud are (1) a false representation (2) in reference to a material fact (3) made with knowledge of its falsity (4) with intent to deceive and (5) with action taken in reliance upon the representation.

■ 4. The representation of the insured that he had not consulted a physician regarding his health was material as a matter of law.

■ 5. The fact that the insured had failed to disclose a visit to a physician does not in itself establish fraud.

■ 6. An applicant for insurance is not required to disclose the fact of consulting a physician for slight or temporary ailments.

■ 7. Where reasonable men may differ on the question of whether a false answer was knowingly made with intent to deceive, it is a question to be submitted to the jury.

■ 8. Where there is no room for conjecture as to the falsity of the representations and of the knowledge of such falsity, and there is no countervailing evidence, the requisite intent to defraud may be presumed.

■ 9. Under the facts of the instant case, fraud cannot be presumed. It is a question for the Court sitting as a jury.

10. The National Service Life Insurance in the amount of $10,000 represented by Certificate No. V 307 44 02 was in full force and effect at the death of the insured, Frank Kammer, and the beneficiary, the plaintiff, is entitled to the benefits thereof.

Judgment will be entered accordingly.